KAIBAB INDUSTRIES, INC., Plaintiff-Appellee and Cross-Appellant, *v.* FAMILY READY HOMES, INC., *et al.*, Defendants.—(Teren Waldsmith *et al.*, Defendants-Appellants and Cross-Appellees; Northwest Bank of Peoria, Defendant-Cross-Appellee.)

Third District   No. 81—618

Opinion filed January 7, 1983.—Rehearing denied February 16, 1983.

Thomas E. Leiter, of Leiter, Leiter and Sahn, of Peoria, for appellants.

Anthony P. Corsentino and Arthur J. Inman, both of Peoria, for appellee.

Brent H. Gwillim, B. Douglas Stephens, Jr., and Nicholas J. Bertschy, all of Heyl, Royster, Voelker & Allen, of Peoria, for cross-appellee Northwest Bank of Peoria.

JUSTICE SCOTT delivered the opinion of the court:

This case had its birth in the judicial system almost nine years ago, and this is its second appearance before this court. (See *Kaibab Industries, Inc. v. Family Ready Homes, Inc.* (1978), 80 Ill. App. 3d 782, 372 N.E.2d 139.) The factual background of this litigation is set forth in the previous appeal; however, for the sake of clarity and continuity as we address the issues presented in this appeal we will reiterate the historical background of this appeal.

Kaibab, the plaintiff, obtained in Arizona a judgment for $133,269 against defendant B. F. Waldsmith on December 10, 1973. This judgment was subsequently entered in Peoria County under the Uniform Enforcement of Judgments Act (Ill. Rev. Stat. 1975, ch. 77, par. 88 *et seq.*). In 1975 citation proceedings were filed in Tazewell County to discover assets which the citation defendants Gary Waldsmith, Teren Waldsmith, Linda Waldsmith, now Linda Burke, might have fraudulently received from their father, B. F. Waldsmith, the judgment debtor. Rooster I Corporation is also a citation defendant whose role in this litigation will be more amply set forth as we confront the issues presented for determination.

After several evidentiary hearings, final judgment was entered by the circuit court of Tazewell County, which found that certain parcels of real estate in the name of Linda Waldsmith were subject to the claim of Kaibab against her father, B. F. Waldsmith, but the judgment

held that the general assets of the citation defendants were not subject to the claim of Kaibab.

On January 19, 1978 (rehearing denied April 12, 1978), this court affirmed the Tazewell court's judgment as to the parcels of real estate but reversed the remainder of the judgment order and remanded the case to the trial court for further proceedings, to-wit, further discovery. This court in its 1978 opinion stated:

> "The record does not indicate, however, whether any of the disputed funds were returned to one or both of defendant's corporations, or whether defendant's corporate holdings represent assets which could be reached by plaintiff. Therefore, in order to insure justice between the litigants, we believe the parties should be allowed further discovery, particularly as to the corporate records." *Kaibab Industries, Inc. v. Family Ready Homes, Inc.* (1978), 80 Ill. App. 3d 782, 786.

After exhaustive discovery proceedings followed by a trial before the circuit court of Tazewell County, a judgment was entered for $103,507, being the amount of plaintiff Kaibab's judgment less setoffs, together with statutory interest from and after November 17, 1974, against citation defendants Gary Waldsmith, Teren Waldsmith, Linda Waldsmith and Rooster I Corporation. The trial court refused to declare certain residential property (909 Oakwood in East Peoria) to be subject to the claim of Kaibab. The trial court further dismissed garnishment proceedings against the citation-garnishee defendant Northwest Bank of Peoria.

A further recital of facts will be set forth as the same becomes necessary for a proper understanding and determination of the issues raised in this appeal.

The citation defendants Teren Waldsmith, Gary Waldsmith and Linda Waldsmith assert that the trial court improperly entered judgment against them for indebtedness owed to the plaintiff Kaibab by a third party, namely, their father, B. F. Waldsmith.

To place this issue in the proper perspective, the record discloses that the plaintiff Kaibab had a judgment against B. F. Waldsmith but repeated efforts to obtain service on the debtor for citation proceedings failed. At one time or another over the course of years the debtor B. F. Waldsmith was referred to as a wraith, a phantom and a nomadic judgment debtor. Unable to proceed directly against the debtor, the plaintiff Kaibab instituted supplemental proceedings against the children of the debtor and Rooster I Corporation in an effort to discover assets which could be used for the satisfaction of its claim. See Ill. Rev. Stat. 1981, ch. 110, par. 73, and Supreme Court

Rule 277 (87 Ill. 2d R. 277).

Through evidence adduced at various court hearings it was established that in the years of 1973 and 1974, but prior to November 14, 1974, certain cash deposits standing in the name of Rooster I Corporation and Projects Management Inc.[1] were placed in the name of the citation defendants Teren, Gary and Linda Waldsmith. As of November 14, 1974, there had been deposited in the names of said individuals the aggregate sum of $515,000 which was evidenced by a certificate of deposit at the Jefferson Trust and Savings Bank of Peoria, Illinois. On November 14, 1972, the certificate of deposit was exchanged in cash and the entire sum less $20,000[2] was delivered to the president of Rooster I Corporation, namely, the judgment debtor B. F. Waldsmith. The amount of money on deposit in Jefferson Trust as of November 14, 1974, in the names of the citation defendants Teren, Gary and Linda Waldsmith was evidenced by promissory notes payable to Rooster I Corporation. Citations proceedings were not commenced against the citation defendants until April 11, 1975, or almost five months after Teren, Gary and Linda Waldsmith had, with the exception of $20,000, divested themselves of the funds. The Waldsmith children first explained this transaction by claiming that the money represented an investment pool of their money and was given by them to their father for purposes of investment. After remand of this case by this court in 1978, the Waldsmith children abandoned the "investment pool" explanation and in lieu thereof explained that they were handling corporate funds, to-wit, funds of Rooster I Corporation.

The foregoing transaction concerning the transfer of $515,000 was deemed by the trial court to constitute fraud upon the creditors of B. F. Waldsmith, and the court concluded that Gary, Teren and Linda Waldsmith were active participants in the fraud and consequently judgment was entered against them.

■ There may or may not have been a well-planned fraud perpetrated on the judgment creditor Kaibab. Our law attempts to provide a remedy for every wrong, but the remedy in the instant case is not to be found within the framework of section 73 of our Civil Practice Act. Section 73 provides in pertinent part as follows:

"(c) Compel any person cited, other than the judgment

---

[1]Projects Management Inc. and Rooster I Corporation for all intents and purposes were one and the same and will be referred to as Rooster I.

[2]Gary Waldsmith retained $20,000 of the funds, claiming that the same belonged to him. No claim has been made for this sum nor is it a subject in this appeal.

debtor, to deliver up any assets so discovered, to be applied in satisfaction of the judgment, in whole or in part ***." Ill. Rev. Stat. 1975, ch. 110, par. 73(2)(c).

The facts of this case do not fall within the framework of section 73. The plaintiff Kaibab in its brief and its counsel during oral argument conceded that the Waldsmith children did not have the funds in question in their control or possession at the time the citation proceedings were commenced, but assert that such fact is of no consequence since the purpose of a citation is to uncover assets which had previously been fraudulently concealed. In support of this tenuous argument the plaintiff Kaibab relies on the case of *Alan Drey Co. v. Generation, Inc.* (1974), 22 Ill. App. 3d 611, 317 N.E.2d 673. In *Drey* the judgment debtor, Generation, sold to McGraw-Hill, a citation defendant, a subscriber list for $150,000. The $150,000 was applied to benefit personally officers of Drey and not to the payment of corporate debts. The sale was consummated while the proceeding on the judgment awarded to the plaintiff Drey was stayed by order of court. After Drey's judgment against Generation had been confirmed, the plaintiff Drey in a supplemental proceeding sought judgment against McGraw-Hill, citation defendant, on the theory that the transfer by Generation was a fraudulent conveyance and McGraw-Hill having notice of the fraudulent intent of the vendor was a participant in the fraud. The plaintiff obtained judgment against McGraw-Hill, which was affirmed by the reviewing court, which held that the evidence was sufficient to support a finding that McGraw-Hill knew or should have known of Generation's fraudulent intent in selling the subscribers list and hence the transferee (McGraw-Hill) was not a *bona fide* purchaser.

We have set forth the salient facts in the *Drey* case because plaintiff Kaibab argues so strenuously that it is applicable to the instant case. Plaintiff deems it to be of great import that McGraw-Hill paid money and purchased the subscriber list a long time prior to the issuance of a citation by Drey. He equates that situation to the one in the instant case where the children of B. F. Waldsmith had had funds in their possession a long time, to-wit, approximately five months, before the citation proceedings were instituted against them. What plaintiff Kaibab overlooks or ignores is the fact that McGraw-Hill still had the customer lists in its possession, that they were a valuable asset and that the transferee had actual knowledge that the transfer of the lists would put the Generation out of business and defeat the claim of Drey, the judgment creditor. To accept the reasoning of the plaintiff Kaibab would result in a distortion of the law to the extent that indi-

viduals in our State could be held responsible for debts of a third party if at any time assets of third party had passed through their hands.

■ The decision in the *Drey* case, while being correct in that case, is not precedential in light of the facts in the instant case. This conclusion is based upon several factors. First, as stated, McGraw-Hill, the transferee, still had in its possession valuable assets, to-wit, subscriber lists, the value of which could have been used to satisfy the claim of Drey. Had McGraw returned the lists to Generation prior to the citation proceedings, no judgment would have been entered against the transferee. Secondly, the element of fraud is clearly present in the *Drey* case. An examination of the record fails to sustain fraud in the instant case. The record contains evidence which supports a finding that Rooster I Corporation through its president transferred $515,000 to Teren, Gary and Linda Waldsmith and the transferees in exchange gave to the corporation promissory notes for an identical amount. When the approximate sum of money was returned to the corporation by the transferees by delivery to its president, the promissory notes were cancelled. All of the events transpired months before the section 73 proceedings were commenced. It can only be concluded that the judgments against the Waldsmith children should not have been entered by the trial court.

We are next confronted with the issue as to whether the trial court properly entered judgment against the citation defendant Rooster I Corporation.

The trial court in entering judgment against Rooster I specifically found that the corporation was liable under the "alter ego" theory. In its brief the plaintiff states, "This is not precisely a case of 'piercing the corporate veil' or establishing that the corporation was an alter ego of a shareholder." After this statement the plaintiff proceeds to abandon the "alter ego" theory and we believe rightfully so in that under such theory the court merely disregards the corporate entity and holds an individual responsible for his acts knowingly and intentionally done in the name of the corporation. Such a result in the instant case would be unavailing of relief to the plaintiff because liability would be imposed upon the judgment creditor B. F. Waldsmith, rather than Rooster I Corporation.

After abandoning the *alter ego* theory the plaintiff in its effort to support its judgment advances arguments which can be described as a "fraudulent agent" theory, in that the defendant corporation was the agent who assisted in perpetrating and concealing the fraudulent acts of its president and shareholder, B. F. Waldsmith.

■ The defendant corporation objects to the raising of this new issue for the first time on appeal. The objection is not well taken, since unlike the appellant, an appellee can sustain a decree by any argument and on any basis appearing in the record which shows that the trial court is right. (See *Becker v. Billings* (1922), 304 Ill. 190, 136 N.E. 581; *Hall v. Humphrey-Lake Corp.* (1975), 29 Ill. App. 3d 956, 331 N.E.2d 365; and *Huber v. Watts* (1982), 110 Ill. App. 3d 614.) We will consider the theory and arguments in support of the same which is advanced by the plaintiff for the first time on appeal.

■ In order that the "fraudulent agent" theory prevail, the plaintiff in its brief argues that the assets of Rooster I Corporation were one and the same as the assets of judgment debtor B. F. Waldsmith. Unless this argument can be proved by evidence adduced during trial, then judgment entered against the citation defendant was not proper.

Directing our attention to the structure and actions of Rooster I Corporation, we find that it was incorporated on December 8, 1965, and throughout the ensuing years annual reports to the Secretary of State and other corporate records were filed as required by law. The corporation had approximately 100 shareholders and had outstanding 90,000 shares of stock, of which approximately 25,000 were owned by B. F. Waldsmith, who with the exception of one year served as president of the corporation. Throughout the years corporate minute books were kept which among other things set forth the voting record of shareholders and the amount of dividends paid to them. Voluminous discovery undertaken by the plaintiff failed to disclose that the corporation paid any personal expenses of B. F. Waldsmith or provided him with any unusual or questionable remuneration.

The plaintiff argues that the transfer of $515,000 to the children of B. F. Waldsmith was a most unusual procedure and it may well have been, but it cannot be claimed that it was done without corporate authority. The minute book of the corporation provides that the president and secretary were authorized to make loans and such authority was general and unrestricted. As previously set forth the transfer of the funds to the Waldsmith children was evidenced by promissory notes given to the corporation which were cancelled when they divested themselves of the funds by delivering the same to B. F. Waldsmith, president of the corporation. The funds while in the names of Teren, Gary and Linda Waldsmith earned interest (approximately $25,000) and such earnings were reported in the corporate tax returns.

In studying the brief of the plaintiff this court notes the inconsistencies contained therein. In some instances the plaintiff asserts that

the money ($515,000) belonged to the judgment debtor and that the corporation assisted him in defrauding his creditor by claiming corporate funds were involved. Then a contrary position is taken when the plaintiff states, "What is clear, however, is that the president of Rooster I was able without so much as word [sic] in corporate records, to take one half million dollars from corporate coffers ***." If this latter statement is accurate and the funds were those of the corporation, then they would not be subject to a citation judgment or a general judgment since the corporation is not and never was indebted to the plaintiff Kaibab.

We note the inconsistent statements of the plaintiff since it highlights the fact that the plaintiff has not been able to prove that the funds in fact belonged to the judgment debtor. Unless such was proved the "fraudulent agent" theory advanced by the plaintiff cannot prevail. The trial court's judgment against Rooster I Corporation was improperly entered because it is based upon conjecture and speculation. The plaintiff's argument in many instances is predicated upon the assumption that Rooster I had the burden of proving that its actions were not improper and fraudulent. We disagree with this assumption. It is true that our previous opinion in this case (80 Ill. App. 3d 782, 372 N.E.2d 139) discussed "badges of fraud" giving rise to an inference of presumption of fraud which shifts the burden of proof to the defendants. We believe that this language was unfortunate in view of the fact that this court specifically remanded the case for further discovery of the whereabouts of disputed funds and whether corporate holdings represented assets which could be reached by plaintiff. The garnering of such information was clearly within the province of the plaintiff. To hold otherwise would compel the citation defendants to prove that they were liable.

We note that the plaintiff attempted to bolster its argument by the citation of a number of cases, to-wit, *Alan Drey Co. v. Generation, Inc.* (1974), 22 Ill. App. 3d 611, 317 N.E.2d 673; *Hinkley v. Reed* (1899), 82 Ill. App. 60; *Sondheimer v. Graeser* (1898), 172 Ill. 293, 50 N.E. 174; and *Harris v. Aimco, Inc.* (1978), 66 Ill. App. 3d 60, 383 N.E.2d 631.

We have previously discussed the *Drey* case and hence will only note that relief was given to a creditor in a citation proceedings when the asset in question was still in the possession of the transferee and two corporations knowingly connived to defraud the creditor. The *Hinkley* case involved a situation where an insolvent partnership transferred all of its assets to a corporation which was 99.77% owned by the partner. Such transfer was held to be fraudulent. The

*Sondheimer* case relates to the issue of priority of creditors, and the *Harris* case set aside a conveyance of real estate which was held to be fraudulent because it was made for the purpose of paying a fraudulent debt. We have carefully examined the cases cited by the plaintiff and fail to find that they have any bearing on the issue relating to the liability of Rooster I Corporation.

The defendants further argue that the judgments against them should be reversed or remanded because of lack of jurisdiction of the Arizona court and fraud in the procurement of the judgment. Having determined that the judgments were not properly taken against the citation defendants it could be argued that this issue need not be determined. In view of the fact that future litigation may ensue from this case we deem it best to address the jurisdictional question. We believe defendants' contention to be without merit. They are citation defendants and not the judgment debtor. They were not parties in the original Arizona proceedings and would have had no standing to intervene or raise defenses in such proceedings and it logically follows that they cannot now wage a collateral attack on the judgment in the Illinois courts. We are of the further opinion that the judgment debtor B. F. Waldsmith would be precluded to now raise a jurisdictional question as to the Arizona judgment. (See *Evans v. Advance Schools, Inc.* (1979), 70 Ill. App. 3d 947, 388 N.E.2d 1003.) However, the ability of a registering court to inquire into the jurisdiction of a rendering court is not infinite but rather is limited by the principles of *res judicata.* See *Ross & Chatterton Law Offices v. Lewis* (1982), 109 Ill. App. 3d 856.

The next issue to which this court directs its attention is raised in a cross appeal by the plaintiff and is whether the trial court correctly held that residential real estate at 909 Oakwood Road in East Peoria was beyond the reach of the plaintiff as a creditor of B. F. Waldsmith. The factual background which gave rise to this issue is as follows. B. F. Waldsmith, the judgment debtor, and his wife obtained the real estate in question on August 3, 1951. On August 19, 1952, the Waldsmiths by warranty deed conveyed the property to Ethel Land, the mother-in-law of B. F. Waldsmith. The deed recited that the conveyance was for $1 and other valuable consideration. The deed also had affixed to it revenue stamps in the sum of 55 cents. The mother-in-law, Ethel Land, by deed dated June 6, 1962, and recorded January 2, 1974, conveyed the real estate to Gary Waldsmith, son of the judgment debtor. In 1962 the grantee Gary Waldsmith was 14 years of age. The grantee Gary and his wife by warranty deed dated August 28, 1975, and recorded September 19, 1975, conveyed the real estate

to Verlin Baysinger and his wife Mary. The record supports a finding that Verlin Baysinger was a business associate and friend of the judgment debtor. Evidence further discloses that B. F. Waldsmith and his wife resided in the premises at 909 Oakwood Road, probably continuously from sometime in the 1950's. This finding is supported by testimony of neighbors, telephone listings, utility installation records, voters registration, and by various corporate records upon which he listed his address. There is further evidence that B. F. Waldsmith treated the property as if he was the owner of the same. He listed the property as an asset on a financial statement and on an occasion he informed a neighbor that he was selling the premises.

The plaintiff in the trial court attempted to prove that regardless of the fact that title to the real estate was not in the judgment debtor's name, he nevertheless had such a beneficial interest in the same that it should be applied in satisfaction of his debts. The trial court ruled contrary to this claim and held that there was a failure of the requisite proof to support a "constructive trust." In its cross-appeal plaintiff agrees that a "constructive trust" had not been proved but asserts that the evidence would not only support but compel a finding and order declaring that a "resulting trust" had been created and therefore the real estate was subject to the debts of the judgment debtor.

■■■ The general rule is that a resulting trust is created by operation of law and arises out of a presumed intention of the parties as evidenced by their acts and conduct. A resulting trust has been called an "intent enforcing" trust created by operation of law and having its roots in the presumed intention of the parties. (See *West v. Scott* (1955), 6 Ill. 2d 167, 128 N.E.2d 734.) A further guideline in determining whether a resulting trust has been created is set forth in the case of *Steiner v. Lawson* (1966), 71 Ill. App. 2d 392, 404-05, 219 N.E.2d 121, 127, wherein it was stated:

> " '[A] resulting trust (arises) wherever the circumstances surrounding the disposition of property raise an inference, not rebutted, that the transferor does not intend that the person taking or holding the property *** should have the beneficial interest therein.' "

The law is further well established that the burden of proof rests upon the party seeking to establish a resulting trust, and the evidence to be effective for this purpose must be clear, convincing, unequivocal, and unmistakable. See *West v. Scott* (1955), 6 Ill. 2d 167, 128 N.E.2d 734.

It is clear from the foregoing that the crucial element in creating

a resulting trust is "intent" and that such intent can be proved by surrounding circumstances, but such proof must be clear and convincing.

During the trial of this case testimony of Herman Hessick was excluded by the court which was to the effect that B. F. Waldsmith, the judgment debtor, during the late 1940's and early 1950's was building houses and was receiving numerous complaints from purchasers concerning alleged defects in the construction. Had the trial court been considering the possible creation of a resulting trust then this testimony should have been admitted, since it related to the possible intent or motive of the judgment creditor in his conveyance of the real estate to his mother-in-law, Ethel Land. The conveyance to Land did recite consideration which was bolstered by the affixing of revenue stamps on the deed, however, the revenue stamps being in the sum of 55 cents reflected the value of the property to be less than $1,000 or an unrealistic valuation. There is no evidence that Land lived in the premises or ever exercised any control over the same. The next conveyance was to a son of the judgment debtor, age 14 years, who years later conveyed the premises to Dr. Verlin Baysinger, a business associate, and in the words of the trial court, a crony of the judgment debtor. Neither the son Gary or Baysinger ever exercised any control over the premises or paid for any maintenance or expenses relating to it. Throughout the years the property was titled in a mother-in-law, son and friend of the judgment debtor.

■ The evidence is clear and convincing that the individual enjoying the beneficial interest in the property was the judgment debtor. He and his wife resided there for many years. It was the home where they raised their three children. The telephone was listed in the wife's name. Utility records were listed in the name of the judgment debtor. Individuals met him at the residence for the purpose of transacting business. He listed the property as an asset he owned when he executed a financial statement with a lending institution.

The facts surrounding the conveyance of the property and the use of the same by the judgment debtor who in all respects exercised dominion over it establish an inference, not rebutted, that the transferor did not intend that the parties holding title to the same should enjoy the beneficial interests of the property. The situation in the instant case, while not identical, can nevertheless be likened to the case of *Steiner v. Lawson* (1966), 71 Ill. App. 2d 392, 219 N.E.2d 121. This court concludes that as to the real estate identified as 909 Oakwood, East Peoria, Illinois, a resulting trust was created and the decision of the trial court as to this realty is reversed and this case is remanded

to the trial court for such further proceedings as are necessary so that the value of the premises can be applied in payment of the indebtedness of B. F. Waldsmith to the plaintiff, Kaibab Industries, Inc. The legal description of the real estate is as follows:

> "Lots Fifteen (15) and Sixteen (16) in Block One (1) in Oakwood Park, being a Subdivision of part of the West Half of the Southwest Quarter of Section Twenty Six (26) North, Range Four (4) West of the Third Principal Meridian; situated in the County of Tazewell and State of Illinois."

■■ The plaintiff also raises by cross-appeal the issue as to whether the trial court erred in dismissing garnishment proceedings against the citation-garnishee defendant, Northwest Bank of Peoria.

The bank became enmeshed in this litigation after the trial court rendered its decision for plaintiff in the sum of $103,507 against citation defendant Rooster I Corporation. On September 1, 1981, the bank was served with an affidavit for non-wage garnishment, a non-wage garnishment summons and a citation to discover assets, all directed to a Rooster I Corporation account in the bank. The bank was directed to appear in the circuit court on September 23, 1981. Prior to appearance it was indicated by a bank officer to the plaintiff that there was $14,000 (later corrected to the sum of $11,000) in the target account. The bank on September 21, 1981, filed a response with an affidavit dated September 17, 1981, indicating that on that date there was $179.19 in the account. The trial court dismissed the garnishment defendant bank upon the acceptance and filing of an appeal bond and apparently predicated its action upon Supreme Court Rule 305, which provides in substance that upon filing of a notice of appeal and timely filing of an appeal bond, enforcement of a judgment for money only is stayed. (See 87 Ill. 2d R. 305(a)(1).) This court has held that the dismissal of garnishment proceedings after a *supersedeas* bond was presented, approved and filed was a stay of proceedings for purposes of Supreme Court Rule 305 which did not affect the validity of the judgment, which may be enforced if it is affirmed on appeal. (*Kurek v. Kavanagh, Scully, Sudow, White & Frederick* (1977), 50 Ill. App. 3d 1033, 365 N.E.2d 1191.) The trial court was correct in its dismissal of the Northwest Bank of Peoria.

We have briefly reviewed the action of the trial court in regard to the Bank and determined that its action was correct even though the issue could have been disregarded on the grounds of mootness. Having reversed the judgment entered against the citation defendant Rooster I, the garnishment proceedings instituted by plaintiff would of necessity fall since the judgment supporting the same was no

978

longer *in esse.*

This case being remanded to the trial court for further proceedings, it is not desirable, necessary or beneficial for this court to consider other issues raised in this appeal. The amount of judgment and the awarding or denial of costs will again be within the province of the trial court.

For the reasons set forth, the circuit court of Tazewell County is affirmed in part, reversed in part and remanded with directions contained in this opinion.

Affirmed in part, reversed in part, and remanded with directions.

STOUDER and HEIPLE, JJ., concur.