PETER VERBAERE *et al.*, Plaintiffs-Appellants, v. COMMUNITY BANK OF HOMEWOOD-FLOSSMOOR, Defendant-Appellee.

First District (4th Division)   No. 85—2789

Opinion filed September 30, 1986.

IIT/Chicago-Kent College of Law Legal Services Center, of Chicago (David L. Lee of counsel), for appellants.

Loretta Kilday and Andrew D. Thomas, both of Homewood, for appellee.

PRESIDING JUSTICE LINN delivered the opinion of the court:

Plaintiffs, Peter and Angela Verbaere, bring this appeal seeking reversal of the trial court's order dismissing the first four counts of their nine-count complaint[1] In their complaint the Verbaeres allege that defendant Community Bank of Homewood-Flossmoor (the bank) wrongfully seized $8,754.84 from the Verbaeres' savings account. Count I alleges that the bank breached a contract it had with the Verbaeres; count II alleges that the bank breached a fiduciary duty it owed to the Verbaeres; count III alleges that the bank breached an express trust existing between it and the Verbaeres; and count IV alleges that the bank breached a resulting trust existing between it and the Verbaeres.

Although the record is somewhat confusing, it appears the trial court dismissed counts I through IV after finding that the bank complied with industry custom in seizing the Verbaeres' cash deposit and applying those funds to a mortgage debt which the bank held against the Verbaeres' residence.

We affirm in part, reverse in part, and remand for further proceedings.

BACKGROUND

This matter is before us following the trial court's ruling that counts I through IV of the Verbaeres' complaint fail to state a cause of action under Illinois law. Accordingly, we must accept as true all of the well-pleaded allegations contained in counts I through IV and must draw all reasonable inferences in the Verbaeres' favor. *Cook v. Askew* (1975), 34 Ill. App. 3d 1055, 341 N.E.2d 13.

The Verbaeres' complaint reveals that the origin of this dispute rests in an April 1978 loan transaction that occurred between the Verbaeres and the bank. At that time, the Verbaeres borrowed $19,891.95 from the bank. Of that amount, $15,500 was borrowed for the purchase of a "Chinook Concourse Mini-Motor Home," and the remaining $4,391.95 was used to purchase a credit-life and credit-disability insurance policy required by the bank. The terms of the credit-life and credit-disability policy provided that in the event that Peter Verbaere was unable to make the payments for the loan as a result of death or disability, the insurance company would thereafter make the loan payments for the motor home on his behalf.

---

[1]The Verbaeres also sued the insurance company who had issued the credit-life and credit-disability policy discussed herein. The counts against the insurance company remain pending in the trial court and are not a part of this appeal.

As collateral for the motor-home loan, the bank received: (1) the credit-life and credit-disability insurance policy; (2) a purchase-money security interest in the motor home; and (3) a second mortgage on the Verbaeres' residence.

In the months that followed the motor-home purchase, the Verbaeres tendered all of their monthly payments in a timely fashion. In December of 1978, however, plaintiff Peter Verbaere sustained injuries that left him permanently disabled. Pursuant to the terms of the credit-life and credit-disability insurance policy, the insurance company began making the monthly payments on the motor home purchased by the Verbaeres.

The insurance company continued to make the monthly payments on the Verbaeres' motor home for the next three years. Then, in March of 1982, the Verbaeres contracted to sell their residence. This was the same residence on which the Verbaeres had previously given the bank a second mortgage as additional collateral for the motor-home purchase. In order to transfer clear title to their residence, the Verbaeres were required to obtain a release from the bank for the second mortgage.

The Verbaeres approached the bank and informed one of the bank's loan officers of their desire to satisfy the mortgage and thereby obtain clear title for their residence. After discussing the matter, the bank agreed to release the second mortgage on the Verbaeres' residence in return for the Verbaeres depositing with the bank $8,754.84, an amount equal to the remaining balance on the motor home. In addition, the bank agreed that it would send the Verbaeres a check each month (deducted from the $8,754.84) equal to the amount of the monthly payment made by the insurance company. By doing this, the cash collateral deposited by the Verbaeres with the bank would remain equal to the outstanding balance on the motor home. Thus, the bank and the Verbaeres agreed to an exchange of the type of collateral being held by the bank as security for the motor home loan: the second mortgage on the Verbaeres' residence was released in return for the Verbaeres depositing with the bank an amount of cash equal to the outstanding balance on the motor-home loan.

Four months later, on October 15, 1982, the bank notified the Verbaeres that it had seized the $8,754.84 deposit being held as collateral and had paid off the motor-home loan in full. This was done without the consent of the Verbaeres and in spite of the fact that the insurance company had made all of the payments due on the motor-home loan in a timely fashion. In addition, when the insurance company subsequently learned that the loan on the motor home had been paid

off (as a result of the bank's seizure), it immediately stopped making the payments due under the credit-life and credit-disability insurance policy.

Soon thereafter, the Verbaeres demanded that the bank return the $8,754.84 or, in the alternative, that the insurance company forward to them the remaining payments due under the credit-life and credit-disability policy. Both the bank and the insurance company denied the Verbaeres' request, thereby prompting the Verbaeres to file this lawsuit.

As noted, pursuant to the bank's motion, counts I through IV were dismissed. The Verbaeres now bring this appeal.

OPINION

I

We first address count I of the Verbaeres' complaint wherein the Verbaeres allege that the bank breached its contract with them when it seized the $8,754.84 from the Verbaeres' account and applied those proceeds to pay off the remaining balance of the motor-home loan. According to the Verbaeres, an enforceable contract was created when the bank agreed to allow the Verbaeres to substitute the collateral held by the bank for the outstanding balance of the motor-home loan; cash in the amount of $8,754.84 was deposited in exchange for the release of the second mortgage on the Verbaeres' residence. This contract was then subsequently breached by the bank when the bank seized the cash and used it to pay off the remaining balance on the motor-home loan.

■ In order to allege a valid cause of action for breach of contract, the plaintiff must plead facts sufficient to indicate that: (1) an offer was made; (2) the offer was accepted; (3) both parties provided mutual consideration for the resulting agreement; and (4) a subsequent breach of that agreement. *Bank of Lincolnwood v. Comdisco, Inc.* (1982), 111 Ill. App. 3d 822, 444 N.E.2d 657.

■ In the case at bar, the Verbaeres have alleged facts sufficient to establish an enforceable contract and a subsequent breach of that contract by the bank. According to the complaint, the Verbaeres offered to deposit cash in exchange for a release of the second mortgage on their residence; the bank accepted that offer; mutual consideration existed in that the Verbaeres promised to deposit cash in a non-interest-bearing account in exchange for the bank's promise to release the second mortgage existing on their residence; and the bank breached that agreement when it seized the cash without the Ver-

baeres' consent. Thus, accepting the allegations of the Verbaeres' complaint as true, an enforceable contract existed and was subsequently breached by the bank.

■ In its brief, however, the bank raises two arguments as to why there was no breach of contract when the bank seized the Verbaeres' cash collateral. First, the bank claims that it is "industry custom" when mortgaged property is being sold to first pay off the mortgagee and thereby extinguish the mortgage debt. Secondly, the bank asserts that it would have committed a felony (in violation of section 118 of "An Act to revise the law in relation to criminal jurisprudence" (Ill. Rev. Stat. 1983, ch. 73, par. 1101)) if it forwarded to the Verbaeres' an amount equal to the payment made by the insurance company (which the insurance company was making pursuant to the credit-life and credit-disability policy).

With regard to the first argument, the bank has confused the mortgage existing on the motor home with the second mortgage existing on the Verbaeres' residence. The second mortgage on the Verbaeres' residence was given to the bank as collateral for the purchase of the motor home. The second mortgage, therefore, was nothing more than additional security which could be seized by the bank should the Verbaeres ever fail to live up to their obligations under the motor-home purchase agreement. The bank did not require the second mortgage in consideration for something additional (such as another loan); the bank merely requested the second mortgage to bolster the amount of security it possessed in return for the motor-home loan. In other words, the "mortgaged property" (the debt of which had to be extinguished before its sale) was the *motor home*, not the Verbaeres' residence.

Thus, when the bank agreed to accept cash collateral in exchange for the second mortgage, the actual "mortgaged property" (the motor home) was never affected; all that occurred was an exchange of the security being held by the bank for the mortgaged property—cash was given in return for a release of the second mortgage on the Verbaeres' residence. Consequently, it is evident that there was no need to pay off the existing motor-home mortgage (pursuant to the industry custom alleged by the bank) because the motor home was not being sold. Apparently, the bank mistakenly believes that an exchange of collateral automatically permits the bank to seize the substituted collateral and thereby pay off the underlying mortgage. We know of no rule of law or equity which supports such a conclusion.

■ The bank's second argument is that it would be committing a fraud on the insurance company to accept payments from it (pursuant

to the credit-life and credit-disability policy) while, at the same time, it lowered the cash collateral deposited with it by the Verbaeres in an equal amount. This argument also fails to comprehend the facts. The Verbaeres purchased the credit-life and credit-disability policy (as required by the bank) for an up-front cost of $4,391.95. The purpose of this policy was to have the Verbaeres, specifically Peter Verbaere, insured and thereby protected should he ever become disabled such that he would not be able to remain employed. If Peter did become so injured, the insurance policy would be triggered and the insurance company would make the payments on the motor home for so long as Peter remained disabled.

In December of 1978, Peter Verbaere suffered an injury and was left permanently disabled. At that time, pursuant to the credit-life and credit-disability policy, the insurance company began making the payments on the motor home. As long as an outstanding balance remained on the motor home, the insurance company was obligated to make the payments due.

This arrangement, however, was completely separate and distinct from whatever collateral the bank required as security for the motor-home loan. When the bank agreed to exchange the second mortgage on the Verbaeres' residence for $8,754.84 in cash, the outstanding balance remaining on the motor home remained unchanged and, as a result, the insurance company's obligation to make payments pursuant to the credit-life and credit-disability policy remained intact. Put differently, the exchange of collateral affected the security held by the bank for the motor-home loan, it did not affect the outstanding balance still owing for the motor home nor did it affect the insurance company's obligations under the credit-life and credit-disability policy. Consequently, by returning to the Verbaeres an amount equal to each of the insurance company's payments, the bank committed no fraud; it simply lowered the amount of cash collateral that it possessed as security for the outstanding balance on the motor-home loan. Thus, the bank is in error regarding its assertion that it would be violating section 118 of "An Act to revise the law in relation to criminal jurisprudence" (Ill. Rev. Stat. 1983, ch. 73, par. 1101), if it did not seize the Verbaeres' cash collateral.

## II

Count II of the Verbaere's complaint alleges that the bank breached a fiduciary duty that it owed to the Verbaeres by seizing the $8,754.84 being held by the bank as collateral. According to the Verbaeres, the bank's breach of fiduciary duty renders it liable not only

for the cash collateral it seized, but also for punitive damages and attorney fees.

■■ Under Illinois law, a fiduciary relationship exists where one person reposes trust or confidence in another who thereby gains a resulting influence or superiority over the other. (*Ray v. Winter* (1977), 67 Ill. 2d 296, 367 N.E.2d 678.) Such a relationship is generally established by facts showing an antecedent relationship which gives rise to the repose of trust and confidence in another. (*Edwards v. Miller* (1978), 61 Ill. App. 3d 1023, 378 N.E.2d 583.) Relevant facts to be considered in determining whether a fiduciary relationship exists include the degree of kinship, disparity in age and business experience, and the extent to which the allegedly servile party entrusts the handling of his financial affairs to the other. *McCartney v. McCartney* (1956), 8 Ill. 2d 494, 134 N.E.2d 789.

In the present case, count III relies on the identical set of facts as that supporting the breach-of-contract claim and then merely states:

"COUNT II--BREACH OF
FIDUCIARY DUTY AGAINST BANK

15. The Bank was a fiduciary of plaintiffs' with regard to the account.

16. The Bank was a fiduciary of plaintiffs' with regard to credit-disability insurance.

17. By the facts alleged, the Bank breached its fiduciary duty."

■■ These claims are plainly insufficient as a matter of law. Count II simply contains no facts from which we can even infer that the Verbaeres entrusted the bank with anything more than fulfilling its obligations under the exchange-of-collateral contract. Indeed, nothing in count II indicates that the relationship between the Verbaeres and the bank was confidential in nature. Rather, count II simply evidences a contractual relationship between the parties. Accordingly, we agree with the trial court that the Verbaeres have failed to state a cause of action based on the bank's alleged breach of a fiduciary duty.

III

■■ Count III of the Verbaeres' complaint alleges that there existed an express trust between the bank and the Verbaeres.

An "express trust" is created by explicit terms manifested in a written instrument or which arise from the direct and positive action of the parties as evidenced by written instruments, words expressed, or both. (*Price v. Illinois* (1979), 79 Ill. App. 3d 143, 398 N.E.2d 365.) The critical element necessary for the creation of an express trust is

an explicit declaration of trust, or circumstances which show that trust was intended to be created between the parties. (*La Throp v. Bell Federal Savings & Loan Association* (1976), 68 Ill. 2d 375, 370 N.E.2d 188.) In addition, to establish the existence of an express trust, the allegations of a complaint must be specific. *Williams v. Teachers Insurance & Annuity Association* (1973), 15 Ill. App. 3d 542, 304 N.E.2d 656.

Count III of the Verbaeres' complaint sets forth the facts leading up to and including the exchange of collateral agreement and then states:

"COUNT III
BREACH OF EXPRESS TRUST AGAINST BANK

15. By the facts alleged, the Bank created a trust of the account with the plaintiffs as beneficiaries and with the Bank as trustee."

Count III then alleges that the bank breached the aforesaid trust and that the Verbaeres are therefore due actual damages, punitive damages, attorney fees, and costs.

■ The allegations of count III fail to adequately allege the creation or existence of an express trust. Count III is entirely devoid of any reference to any type of agreement or understanding (oral, written or otherwise) that the parties ever intended to create a relationship constituting a trust. In fact, count III consists of nothing more than a conclusory allegation as to the existence of an express trust and contains absolutely no facts from which the parties' intent to create such a trust could ever be inferred. Under these circumstances, we agree with the trial court that count III was properly dismissed.

IV

Count IV of the Verbaeres' complaint contends that a resulting trust was created between them and the bank when the cash collateral was deposited with the bank.

■ It is well settled that a resulting trust is created by operation of law and arises out of the presumed intention of the parties as evidenced by their acts and conduct. (*Kaibab Industries, Inc. v. Family Ready Homes, Inc.* (1983), 111 Ill. App. 3d 965, 444 N.E.2d 1119.) The purpose of creating a resulting trust is to accomplish the supposed intent of the parties at the time of the transaction in question. (*First National Bank v. Dierking* (1967), 87 Ill. App. 3d 4, 230 N.E.2d 520.) In order to establish a resulting trust, however, the intent of the parties must be alleged and established, for a court cannot impose a trust where the intent of the parties is unclear. (*In re Estate*

*of Wilkening* (1982), 109 Ill. App. 3d 934, 441 N.E.2d 158.) In addition, it is an elementary rule of pleading that to withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the necessary elements of a cause of action. *Jones v. Eagle II* (1981), 99 Ill. App. 3d 64, 424 N.E.2d 1253.

In the case at bar, count IV of the Verbaeres' complaint contains no allegations from which we can presume, or even infer, that the parties intended to create a trust at the time they agreed to the exchange of collateral. Like count III, count IV relies on the same set of facts (namely, those setting forth the motor-home loan, the exchange-of-collateral agreement, and the bank's seizure of the cash collateral) and then merely states:

"COUNT IV
BREACH OF RESULTING TRUST AGAINST BANK
15. By the facts alleged by operation of law, a resulting trust was created in the account with the plaintiffs as beneficiaries and with the Bank as trustee."

This claim is nothing more than a conclusion. Although the facts alleged in the Verbaeres' complaint are sufficient to establish the existence of an enforceable exchange-of-collateral agreement, there are simply no allegations of fact from which the intent necessary for a resulting trust can be ascertained. Consequently, the Verbaeres' assertion that a resulting trust was created between them and the bank must be rejected.

Accordingly, for the reasons set forth above, the ruling of the trial court dismissing counts II, III, and IV of the Verbaeres' complaint is affirmed. The decision of the trial court dismissing count I, on the other hand, is reversed and this cause is remanded for further proceedings consistent with this opinion.

Affirmed in part and reversed in part.

JIGANTI and McMORROW, JJ., concur.