ANGELA VERBAERE *et al.*, Plaintiffs-Appellants and Cross-Appellees, v. LIFE INVESTORS INSURANCE COMPANY OF AMERICA, Defendant-Appellee and Cross-Appellant.

First District (4th Division)   No. 1—91—0428

Opinion filed February 27, 1992.

David L. Lee Law Offices, of Chicago (David Lee and Frederic F. Brace, Jr., of counsel), for appellants.

Peterson & Ross, of Chicago (J. Robert Geiman, David J. Novotny, and Douglas J. Varga, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Pursuant to section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1989, ch. 73, par. 767), the trial court assessed a penalty and attorney fees against defendant, Life Investors Insurance Company of America. Plaintiffs Peter and Angela Verbaere appeal from the amount of the award, claiming that the trial court erred in awarding their attorney, a law professor working in a law school clinic,

only $40 per hour despite evidence supporting a substantially higher rate. The insurance company cross-appeals, arguing that the judgment entered against it is unjustified because its denial of plaintiffs' claim was not vexatious and unreasonable.

We affirm on the issue of the insurer's liability for the penalty and fee award, but modify the amount of the award to conform with the evidence presented on the reasonable hourly compensation to be awarded plaintiffs' attorney.

BACKGROUND

This is the third appeal involving the Verbaeres and their attempt to recover damages arising out of the conduct of their bank and their insurance company. In April 1978, plaintiffs borrowed $15,500 from the Community Bank of Homewood-Flossmoor to buy a motor home. They were required to obtain credit-life and credit-disability insurance to secure the loan, and the premium for this insurance added another $4,391.95 to the borrowing. As collateral for the loan the bank took a second mortgage on the Verbaeres' residence and also a purchase money security interest in the motor home. Plaintiffs obtained credit-disability and credit-life insurance from three companies, one of which was defendant. The purpose of the insurance was to cover the amount of plaintiffs' indebtedness to the bank in the event of plaintiffs' total disability or death. Defendant issued a certificate to the bank guaranteeing monthly payments of $125 for a maximum of 10 years in the event that death or disability rendered plaintiffs unable to make the loan payments.

In December 1978, Peter Verbaere suffered severe head injuries that left him totally and permanently disabled. The record suggests that the other two insurance companies paid disability credit benefits under their policies in lump sums, reducing the amount of the indebtedness. Life Investors elected instead to remit proceeds in the monthly payments of $125. Life Investors paid the bank $125 per month from the time of the disability until October 1982. What happened at that time triggered the lawsuit against the bank (*Verbaere v. Community Bank* (1986), 148 Ill. App. 3d 249, 498 N.E.2d 843, *appeal denied* (1987), 113 Ill. 2d 586, 505 N.E.2d 363) (*Verbaere I*) and the insurer (*Verbaere v. Life Investors Insurance Co.* (1987), 157 Ill. App. 3d 676, 510 N.E.2d 946) (*Verbaere II*).

In March 1982 plaintiffs contracted to sell their residence, and in order to clear title, they were required to obtain a release of the bank's second mortgage, which the bank held as part of the security under the motor home purchase plan. To obtain the bank's re-

lease of the second mortgage, plaintiffs agreed to substitute as collateral an amount of cash equal to the remaining balance on the motor home loan, $8,754.84. In accordance with this agreement, plaintiffs deposited the funds with the bank.

In October 1982, upon the sale of plaintiffs' residence and attendant release of the second mortgage, the bank seized plaintiffs' funds to satisfy the motor home indebtedness. In *Verbaere I*, this court explained why the bank's justification for seizing the collateral was ill-founded and why the dismissal of the action for breach of contract against the bank would be reversed. (*Verbaere I*, 148 Ill. App. 3d at 254-55.) Thereafter, the bank and the plaintiffs settled the litigation between themselves.

At the time the bank converted plaintiffs' deposited funds, the bank simultaneously notified Life Investors that the indebtedness was paid off. The insurance company immediately discontinued paying the monthly disability benefits under the policy, without further investigation.

Because Life Investors refused to continue paying the disability benefits, plaintiffs filed suit to collect the remaining proceeds. The parties presented cross-motions for summary judgment based on the policy language. Apparently ignoring the beneficiary provision in its own policy, Life Investors interposed a defense based on a cancellation provision, asserting that the bank's discharge of the motor home loan terminated the insurance. This position was rejected by the trial court and by the appellate court, which held, as a matter of law, that plaintiffs were entitled to receive the full insurance benefits that had vested upon Peter Verbaere's total disability. (*Verbaere II*, 157 Ill. App. 3d 676, 510 N.E.2d 946.) The appellate opinion explains in detail the grounds for the decision, citing case precedent.

Life Investors had declined to enter settlement negotiations with plaintiffs until after the trial court had ruled on the cross-motions for summary judgment. At that point the company indicated it would consider settlement, but only if plaintiffs waived the right to seek section 155 sanctions. After this court's decision in *Verbaere II*, the parties settled the insurance claim but reserved the issue of attorney fees and penalties under section 155 of the Insurance Code. Thereafter, Judge Hoffman entered a finding of liability against the insurer and transferred the case to a different judge for an evidentiary determination of the amount of penalty and attorney fees to be awarded.

At the hearing on fees, plaintiffs presented the statement of their attorney, David L. Lee, who spent 207.13 hours on legal services to his clients. Also offered at the hearing were two other statements, one for a small amount submitted by a different lawyer and one for 214.85 hours of law student time. Plaintiffs also submitted the affidavit of Ruthanne K. DeWolfe, a supervising attorney with the Legal Assistance Foundation of Chicago. The affidavit stated that a reasonable rate of compensation for Professor Lee was $175 per hour and a reasonable rate for the law students was $40 per hour. Finally, plaintiffs submitted an order of an administrative law judge from the Illinois Human Rights Commission, in which the judge awarded Lee fees for his services at the rate of $175 per hour and his students at the rate of $40 per hour.

The insurance company did not present an expert to testify regarding reasonable hourly rates in the community but instead offered its own time statements showing that its lawyers had spent 244.6 hours on the case through August 1990. The insurer did not do a breakdown of individual hourly rates charged by its attorneys but claimed an "average" rate of $101.75 per hour.

The trial court questioned Professor Lee about the structure of the legal clinic at IIT Chicago-Kent, where Professor Lee was employed at the time. Faculty members who handle cases from the clinic are required to generate attorney fees equal to their salary, with some adjustments. To the extent a professor generates fees that fall below the salary, he or she receives a pay cut the next year. If, on the other hand, the fees generated exceed 20% over salary, the professor receives a bonus and pay raise.

Professor Lee testified that he had received an award of $175 per hour in the past and that he would quote that rate for a "contract action of some complexity." He generally charged a flat fee plus a contingency and did not have a set hourly rate, although he did have a "professional courtesy rate" of $75 per hour that he charged other faculty members for wills and estates.

The trial judge ultimately awarded Professor Lee fees at the rate of $40 per hour for 180 hours of work. The judge disallowed compensation for the law student hours and the nine hours of a different attorney. The judge noted that the law clinic would not be out any money for the law student time, since the students received class credits instead of money. Further, he stated that the documentation of the student time was inadequate. With respect to Professor Lee's services, the court stated that the work was of high quality and the result was good. Recognizing that considerable time had

been spent, the court allowed 180 out of 207.13 hours claimed. The court then ruled, however, that it would not grant an award of fees that exceeded the amount of the recovery by the clients. The court expressed concern that a private firm would not have been able to ask a client to pay $48,000 for a $10,000 recovery, stating, "That's just not good business sense ***."

Opinion

I

We first review the liability issue, which the insurer raises in its cross-appeal. According to Life Investors, the trial court abused its discretion in assessing statutory sanctions for "vexatious and unreasonable" refusal to pay the disability insurance claim. (Ill. Rev. Stat. 1989, ch. 73, par. 767.) The insurer's only justification for its refusal to continue paying the insurance benefits, however, rests on its facile interpretation of one provision in the policy, which states:

> "If through prepayment, renewal, refinancing, or otherwise, the indebtedness in connection with which this insurance is written is discharged prior to its scheduled maturity date, the insurance hereunder will be cancelled and a refund granted to the Insured calculated in accordance with [the Rule of 78's] ***."

This provision refers to the cancellation of insurance coverage—not termination of proceeds—and the corresponding partial *refund of the premium* in the event that the original loan is discharged in advance of its maturity date. Since the coverage period of credit insurance is matched to the life of the loan, an early payment or other discharge of the original loan obviates the need for continued credit insurance. Accordingly, the unearned premium must be refunded the insured, whose credit obligation has ceased at that point and whose insurance on the obligation has been cancelled because there is nothing left to insure.

Unlike the cancellation provision, the language of the beneficiary provision is specifically directed to the situation in which a disability has occurred during the coverage period:

> "All proceeds payable under this policy as the result of the disability of an Insured Obligor are payable to the Creditor to the extent of its interest and the balance, if any, shall be paid to the Obligor, if living, or to the estate of any Obligor."

In its defense, the insurer argues in its brief that it should not be penalized for relying on a "legitimate" dispute over the meaning

of the policy and that, in any event, the case law is "unsettled" with respect to the precise issue under examination. Neither point is supportable.

While we agree that penalties are not to be awarded under this section if a legitimate defense or denial is asserted under an express term of the policy (see, *e.g., Scudella v. Illinois Farmers Insurance Co.* (1988), 174 Ill. App. 3d 245, 253, 528 N.E.2d 218, *appeal denied* (1989), 124 Ill. 2d 562, 535 N.E.2d 921), we are not persuaded that Life Investors relied in good faith on what it terms a "clear policy provision regarding termination of benefits." Nothing in the cancellation provision refers to termination of existing benefits and to read in such a caveat is to nullify the beneficiary provision in favor of a disingenuous construction of a provision directed to a different situation from that which occurred in this case.

Although the record reveals that the trial court, on summary judgment, gave Life Investors every opportunity to articulate a viable theory to support its complete disregard of the beneficiary provision of the policy, the insurer was unable to do so. The court also commented during the hearing that Life Investors' position was "in the teeth" of precedent, citing *Vogelsang v. Credit Life Insurance Co.* (1970), 119 Ill. App. 2d 67, 255 N.E.2d 479.

In *Vogelsang*, the insurance company had defended against a claim for credit disability proceeds in part because the insured had, in his pleadings, ostensibly agreed that the underlying debt had been paid before the claim was made to the company. In fact, the disabled insured had given notice before the debt was paid, but had not filed suit until after the debt was paid. The insured sought leave to amend in order to clarify the facts. On that issue, the court noted that even the insurer conceded that if the claim had been made before the loan was paid, and no other defense existed, the judgment entered on the pleadings in favor of the insurer would have to be summarily reversed. The insurer thus admitted that payment of the underlying debt did not bar the insured's cause of action for insurance benefits. The court agreed, noting, "[I]t is the onset or commencement of the disability during the period that the policy is in effect which is the condition precedent upon which liability of the company depends." *Vogelsang*, 119 Ill. App. 2d at 71, 255 N.E.2d at 482.

In *Verbaere II*, we found *Vogelsang* dispositive of the law: The occurrence of the disability during the coverage period vests the insured's right to benefits. By extension, we found implicit in *Vo-

*gelsang* "the determination that payment of the debt after disability does not affect plaintiff's right to benefits." (*Verbaere II*, 157 Ill. App. 3d at 679, 510 N.E.2d at 948.) We further noted that the wording of the beneficiary provision itself reinforces this holding because it expressly directs payment of any balance of proceeds, after the creditor's interest has been satisfied, to the insured obligor or his estate. By operation of this language, the insured's right to the insurance proceeds vests upon his disability and cannot then be "cancelled" at the desire of the insurance company, simply because the underlying debt is paid off by funds other than the insurance benefits.

It is noteworthy in the context of section 155 sanctions that Life Investors has never offered even a colorable explanation as to why the beneficiary provision does not govern the facts before the court. The provision is straightforward, as are the undisputed facts of record. Moreover, the beneficiary provision does not conflict in any way with the cancellation provision, which only becomes effective if the insured loan is prematurely discharged and no disability has occurred, thereby leaving the insured with only the duty to refund any unearned premium.

After Peter Verbaere's disability, Life Investors elected to pay out the insurance benefits over time instead of in a lump sum. The record contains a number of letters and internal memoranda showing that Life Investors consistently declined to liquidate the insurance claim in accordance with the bank's payoff figures, choosing instead to pay a higher total amount over the life of the policy. In choosing a payout through installments, however, Life Investors was not free to treat the benefits as contingent upon anything other than the continuing disability of Peter Verbaere for the full 10 years of coverage. When the bank unilaterally discharged plaintiffs' loan in 1982, Life Investors took the position that the bank's action had discharged its own duty to pay the remainder of the insurance benefits. In fact, in response to a letter of inquiry from Angela Verbaere in early 1984, a claims adjustor represented that the company had stopped paying benefits because the *bank* had cancelled the policy. Even assuming the bank had the authority to cancel an insurance policy issued by Life Investors, such a fortuity would hardly absolve the insurance company from its contractual obligation to fully indemnify the insured obligation. Under the facts, it should have paid plaintiffs directly, pursuant to the beneficiary clause.

Instead, Life Investors acted as if it were a stranger to the policy with no questions asked once the bank discharged the underlying loan. Then, in litigation, the insurance company insisted that the cancellation provision in its policy should be given an effect that would dissolve plaintiffs' right to their remaining benefits. Even before the decision in *Verbaere II* affirmed the trial court's grant of summary judgment in favor of plaintiffs and against Life Investors, this court had addressed the insurance company's obligations in the appeal involving the bank, *Verbaere I*. This court was obliged to discuss the respective rights and duties of the bank and insurance company because the bank raised as a defense in that appeal the notion that if it continued to accept the insurance company's disability credit payments after the loan's discharge, the bank would be defrauding the insurance company. This court exposed the fallacy in the bank's position, explaining that the bank's dealings with the collateral for the motor home loan were separate and distinct from the insurance company's duty to pay the disability insurance. We said, "[T]he insurance company's obligation to make payments pursuant to the credit-life and credit-disability policy remained intact. Put differently, the exchange of collateral affected the security held by the bank for the motor-home loan, it did not affect the outstanding balance still owing for the motor home nor did it affect the insurance company's obligations under the credit-life and credit-disability policy." *Verbaere I*, 148 Ill. App. 3d at 255, 498 N.E.2d at 847.

Life Investors took advantage of the bank's mishandling of plaintiffs' collateral to declare its own obligations at an end. In the meantime the bank refused to admit any wrongdoing in using plaintiffs' funds to pay off the loan that was never in default. Plaintiffs, caught in the switches, were left holding the debt. Their efforts to obtain reimbursement from the institutions responsible for the $8,700 hole in their pocket failed and they were forced to file suit.

■■ In *Kohlmeier v. Shelter Insurance Co.* (1988), 170 Ill. App. 3d 643, 659, 525 N.E.2d 94, 105, *appeal denied* (1988), 122 Ill. 2d 576, 530 N.E.2d 247, the court noted that in deciding whether to award attorney fees pursuant to section 155, "a circuit court should consider the insurer's attitude, whether an insured was forced to file suit to recover, and if an insured was deprived of the use of his property." The *Kohlmeier* court also quoted from *Mohr v. Dix Mutual County Fire Insurance Co.* (1986), 143 Ill. App. 3d 989, 999, 493 N.E.2d 638, 645, " 'However, if there is a *bona fide* dispute

about coverage, delay in settling a claim may not violate the statute.' " 170 Ill. App. 3d at 659, 525 N.E.2d at 105.

We do not find this case remotely similar to ones in which an insurance company presents a *bona fide* factual dispute over a coverage issue or otherwise can assert a true policy defense. In *Kohlmeier*, for example, the reviewing court reversed section 155 sanctions assessed against an insurer who had declined to pay benefits under a family health insurance policy. There, however, the insurer's reason for denying the claim was that the insured allegedly had made a material misrepresentation in applying for the insurance, which would void the policy if true.

■■ The essence of the insurance claim was to enforce the company's agreement to indemnify Peter Verbaere for the motor home loan. As the court noted in *Verbaere II*, "Both sides agree that the *purpose of such credit disability insurance is to indemnify a disabled debtor* or obligor for payments becoming due a creditor." (Emphasis added.) (*Verbaere II*, 157 Ill. App. 3d at 678, 510 N.E.2d at 948.) The plaintiffs in this case have now spent close to a decade of litigation to enforce truly basic contract rights. The insurance company paid its lawyers thousands of dollars to argue an interpretation of the policy that neither makes sense within the four corners of the insurance policy nor is consistent with the law.

We do not understand why Life Investors—which underwrote the risk of disability, fixed the premium, and provided for a partial refund of the premium in the event of early discharge of the loan—appears to have difficulty understanding the nature of credit-disability insurance and its own clearly worded beneficiary provision. Nor do we find persuasive Life Investors' attempt to minimize the precedential value of *Vogelsang* as an excuse for pursuing an obtuse legal theory based on the cancellation clause in its policy. *Vogelsang's* reasoning strongly discredits the position Life Investors takes here, as do the comments in *Verbaere I*. Moreover, case law will not always exist to aid in issues of policy construction, and an insurance company should not prop up an unreasonable interpretation with the fortuity that no court has yet squarely ruled on the precise position it takes. Lack of case precedent may be attributable to the possibility that other insurance companies faced with the same situation as exists in the pending case would not have attempted to defend on the grounds asserted by Life Investors. As the court noted in *Vogelsang*, the insurer in that case *agreed* that the insured's payment of the underlying debt did not bar the cause of action for credit disability insurance.

The policy provisions excerpted in this opinion are not highly technical, obscure, or conflicting. They are not ambiguous. There are no disputed factual issues involved. Life Investors has persisted in a plainly unreasonable interpretation of its policy, and we conclude that the trial court did not abuse its discretion in awarding sanctions.

## II

The remaining issue relates to the amount of attorney fees that were awarded, which is the subject of plaintiffs' appeal.

We agree with Life Investors that a trial court's calculation of attorney fees is entitled to considerable deference. We also find that the court in this case did not abuse its discretion in reducing the number of hours for which compensation should be granted. With respect to the claimed hours for student time, the trial court found that the records pertaining to the student work were inadequate, and we accept that as a valid basis for denying fees based on student time. We do not, however, necessarily agree with the implication that fees need not ever be awarded for law student time simply because students receive course credit instead of money. Nonetheless, the burden is on the party claiming fees to provide sufficient evidence to support the claimed amount.

The trial court found that 180 hours out of the 207 claimed by Professor Lee were reasonable and justified. (Life Investors, in comparison, admitted to expending 244.6 hours.) The court declined to apply an hourly rate commensurate with a market approach, however, finding instead that the amount of the insurance claim was too small to justify a large award of fees. Consequently, the court refused to apply the requested hourly rate of $175, despite the fact that Professor Lee had presented evidence in support of that rate.

■■ ■ Life Investors contends that the trial court, in determining the reasonableness of a requested fee, is not bound by the opinion of the petitioning attorney or his experts but may instead rely on its own knowledge and experience. (See *In re Estate of Healy* (1985), 137 Ill. App. 3d 406, 411, 484 N.E.2d 890.) While we agree with this general proposition, we do not believe that competent, uncontradicted expert opinion and other evidence can be disregarded in favor of the belief that a fee award should never exceed the amount of the underlying claim. (See *Keller v. State Farm Insurance Co.* (1989), 180 Ill. App. 3d 539, 536 N.E.2d 194, *appeal dismissed* (1989), 127 Ill. 2d 617, 541 N.E.2d 1106 (awarding fees of

$13,819.50 on an insurance claim recovery of $7,544.67).) Keeping fee awards in line with the amount of a recovery may be a valid ideal, particularly in purely private disputes. In cases involving section 155 of the Insurance Code, however, courts have recognized that insurance companies, with their superior financial resources, may drag out the claims process to discourage claimants. Therefore, if the insurer vexatiously delays or rejects legitimate claims, it must bear the expense resulting from the insured's efforts to prosecute the claim. See, *e.g.*, *Hall v. Svea Mutual Insurance Co.* (1986), 143 Ill. App. 3d 809, 811-12, 493 N.E.2d 1102 (increasing fee award from $8,000 to more than $15,000); *Keller v. State Farm Insurance Co.* (1989), 180 Ill. App. 3d 539, 557, 536 N.E.2d 194 (increasing fee award from contingent-fee computation of $2,514.89 to amount of fee reasonably incurred, $13,819.50); *Calcagno v. Personalcare Health Management, Inc.* (1991), 207 Ill. App. 3d 493, 505, 565 N.E.2d 1330, *appeal denied* (1991), 137 Ill. 2d 663, 571 N.E.2d 146 (allowing recovery of fees under section 155 even when insurance claim has been paid prior to litigation); see also *City of Riverside v. Rivera* (1986), 477 U.S. 561, 91 L. Ed. 2d 466, 106 S. Ct. 2686 (approving a quarter million dollar fee award on a recovery of $33,350 in a Civil Rights Act case).

In the pending case no one has challenged the validity of the finding that 180 hours is a reasonable allowance for the time Professor Lee put into the case. The sole question, then, is whether the hourly *rate* of $40 can be justified on this record and under the law.

■ The evidence of record reveals that Professor Lee was awarded $175 per hour in another matter before a Federal magistrate and that in the opinion of Ruthanne DeWolfe, supervising attorney at the Legal Assistance Foundation of Chicago, an hourly rate of $175 for the work done is reasonable. Life Investors did not directly rebut this or present evidence of rates charged by other lawyers in the community for similar work. Instead, the insurance company noted that it had paid its own lawyers an amount that averaged out to approximately $101 per hour. As Professor Lee points out, however, this hourly rate was determined by dividing the total fees paid by the number of hours incurred, without distinguishing what type of work was done by what level of professional—partner, associate, or paralegal. Certainly, a senior partner and a new associate would not be billed out at the same hourly rate. We reject the "blended rate" approach as having little relevance to what a lawyer with Professor Lee's experience and skills

would charge for comparable legal services. We conclude that the trial court's finding of $40 per hour as a reasonable rate is against the manifest weight of the evidence.

In *Kaiser v. MEPC American Properties, Inc.* (1987), 164 Ill. App. 3d 978, 518 N.E.2d 424, the court listed various considerations a trial court may use in assessing reasonable attorney fees: the skill and standing of the attorney; the nature of the case and novelty or difficulty of the issues; the degree of responsibility required; the usual and customary charges for comparable services; the result or benefit to the client; and whether there is a reasonable connection between the fees and the amount of money involved in the litigation.

Life Investors does not assert that $40 is a reasonable "market" rate, but instead refers to "the numerous factors weighing against a large fee award." It is not clear to us what specific factors Life Investors relies on, but assuming they are one or more of the ones cited above in *Kaiser*, we find that none of them justify such a low rate as was assessed in this case. As noted, the trial court found favorably as to Lee's skill and standing and the benefit to the clients. It is undisputed that Lee was responsible for plaintiffs' representation during this protracted litigation. We have found a reasonable explanation for the amount of time incurred in the case, and although the award may exceed the underlying insurance claim, the amount of time put in is attributable to Life Investors' recalcitrant refusal to pay, not by unnecessary or wasteful acts on the part of plaintiffs. While the legal issues involved were not particularly complex, the insurance company spent at least $25,000 pursuing a policy defense that had no basis in fact, law, or logic. Regarding the reasonable and customary charges for comparable services, we find that Professor Lee's unrebutted evidence established $175 per hour. Accordingly, we find that the fee award in this case should be adjusted upward to reflect that rate.

■ Finally, to the extent that the trial court may have minimized the hourly rate because a legal clinic rather than private law firm was involved, we find the distinction unsupportable. Section 155 sanctions are designed to discourage misconduct on the part of insurers and it might dilute that purpose if an insurance company is assessed fees under a reduced formula because of the fortuity that its insureds were represented by *pro bono* or public interest attorneys instead of private practitioners. See, *e.g., Oldham v. Ehrlich* (8th Cir. 1980), 617 F.2d 163, 169 (Defendant sued by plaintiff having legal aid counsel should not benefit from the fact plaintiff could

not afford private counsel and whether focus is to enable suit by those unable to afford it or to deter misconduct of wrongdoer, legal aid organization merits fee fully as much as private attorney); *Blanchard v. Bergeron* (1989), 489 U.S. 87, 93-95, 103 L. Ed. 2d 67, 75-77, 109 S. Ct. 939, 944-45 (Under "lodestar" evaluation of reasonable attorney fees to be awarded prevailing plaintiffs, number of hours reasonably expended should be multiplied by reasonable hourly rate, and then adjustments may be made depending on circumstances).

For the foregoing reasons, we affirm the trial court's ruling as to Life Investors' liability for attorney fees. We also affirm the trial court's finding that 180 hours of compensable time is reasonable. We modify the sum awarded, however, by multiplying 180 hours by the hourly rate of $175, for a total of $31,500. Finally, we remand this case for a determination of fees reasonably incurred in this appeal. *Keller v. State Farm Insurance Co.* (1987), 180 Ill. App. 3d 539, 557-58, 536 N.E.2d 194.

Affirmed as modified and remanded.

JIGANTI, P.J., and McMORROW, J., concur.