Tatum C. **SINGLETARY, et al.,**
**Plaintiffs–Appellants,**

v.

**CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, et al., Defendants–Appellees.**

No. 93–1849.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 1, 1993.

Decided Nov. 16, 1993.

Steven I. Brody, Charles L. Siemon (argued), Marcella Larsen, Siemon, Larsen & Marsh, Chicago, IL, for Tatum C. Singletary, etc.

Kenneth E. Wile, Charles F. Regan, Fern C. Bomchill (argued), Mayer, Brown & Platt, Chicago, IL, for Continental Illinois Nat. Bank and Trust Co. of Chicago and Continental Illinois Corp.

Francis J. McConnell, David O. Toolan, Chicago, IL, for John R. Lytle.

William G. Patterson, pro se.

Before POSNER, Chief Judge, MANION, Circuit Judge, and WOOD, JR., Senior Circuit Judge.

POSNER, Chief Judge.

From the wreck of the Penn Square Bank more than a decade ago, which nearly dragged the Continental Illinois National Bank down with it, still another case has found its way to this court, a diversity suit by Tatum Singletary and members of his family against Continental and others, charging fraud and other misconduct. The suit was filed in 1989, and dismissed, on the defendants' motion for summary judgment, as barred by the statute of limitations.

We consider at the outset a jurisdictional glitch unremarked by the parties and the district judge. (Diversity suits are full of jurisdictional traps.) Among the defendants are two individuals, William Patterson and John Lytle, who at the time the suit was filed were prison inmates. The complaint treated the state in which each of these men was imprisoned as the state of his citizenship for purposes of diversity jurisdiction. This is incorrect. It should be the state of which he was a citizen before he was sent to prison unless he plans to live elsewhere when he gets out, in which event it should be that state. *Sullivan v. Freeman,* 944 F.2d 334, 337 (7th Cir.1991); *Jones v. Hadican,* 552 F.2d 249 (8th Cir.1977) (per curiam); *Flanagan v. Shively,* 783 F.Supp. 922, 935 (M.D.Pa.), aff'd without opinion, 980 F.2d 722 (3d Cir.1992). The record does not reveal which states these men are citizens of, and since the plaintiffs are citizens of several different states the possibility that the requirement of "complete diversity" (meaning no citizens of the same state on both sides of the litigation, *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806); *Fidelity & Deposit Co. v. City of Sheboygan Falls,* 713 F.2d 1261, 1264–68 (7th Cir.1983)) is not satisfied is more than theoretical.

*Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989), empowers us to dismiss nonindispensable defendants (and these defendants are not indispensable) if necessary to preserve federal jurisdiction. We do not know whether it is necessary, because we do not know what states they are citizens of. We can solve the problem by deciding the merits, then remanding for a determination of these defendants' citizenship. If they are found not to be citizens of any of the states of which the plaintiffs are citizens, no further order will be required. If their presence in the suit is found to be incompatible with complete diversity, the district judge should dismiss them.

Admittedly this case is different from *Newman–Green,* because there the plaintiff had asked the appellate court to dismiss a diversity-destroying defendant. There has been no such request here. If a plaintiff *wants* to retain a nondiverse defendant, it is no business of the court to tell him he can't; the court's job in such a case is to tell the plaintiff that he can't stay in federal court. But when a plaintiff having elected federal jurisdiction goes all through the trial and appeal of his case without breathing any jurisdictional doubts, we think he should be deemed to have consented to the dropping of nondiverse parties if necessary to preserve federal jurisdiction. Otherwise a plaintiff who loses on the merits in the court of appeals could file a petition for rehearing pointing out the presence of the nondiverse defendant and be able to start over in state court. Of course that sort of thing can and does happen in the case of a nonwaivable limitation on federal jurisdiction, but the presence of a nonindispensable nondiverse party is an obstacle to federal jurisdiction that a plaintiff can waive, and we think he should be required to do so when his own carelessness about the requirements of federal jurisdiction was responsible for the case having been allowed to proceed to judgment in the district court and full briefing and argument of the merits in the court of appeals.

We turn to the merits. Tatum Singletary was the president and principal shareholder of Heston Oil Company, a marketer of oil and gas limited partnerships; the other plaintiffs, all Singletarys, were the other shareholders. In August 1981, Heston made a deal with a company called Mahan–Rowsey to buy drilling leases from a third company, Shar–Alan. The purchase price was $4.5 million. Mahan–Rowsey made a down payment of $250,000. The second installment of the purchase price was to be $2 million, paid by Mahan–Rowsey and financed by a loan from Penn Square Bank, and the third installment was to be $2.25 million, paid by Heston and also financed by a loan from Penn Square. William Patterson, a vice-president of Penn Square, handled these loans. Because Mahan–Rowsey had poor credit, Singletary on behalf of Heston paid the second installment with the proceeds of a $2 million loan from Penn Square, a loan he repaid. This left Mahan–Rowsey owing Shar–Alan $2.25 million. Patterson was reluctant to lend money to Mahan–Rowsey

without security, so he asked Singletary—but without disclosing his reason for doing so—to sign another promissory note to the bank, this one for $2.25 million. (Singletary had paid off his previous note to the bank, for $2 million, as we mentioned.) Patterson sent Singletary the note for his signature. The note bore a due date of January 5, 1982, and was not sent to Singletary until shortly afterward. Singletary thought the note secured a letter of credit which, like the note itself, had already expired, and that the only reason he was being asked to sign the note was to repair an omission in Penn Square's files. He neither believed nor had any reason to believe that the note would obligate him to pay anything to anyone. Patterson, however, "booked" a $2.25 million loan to Singletary (that is, recorded a loan for this amount on Penn Square's books), changed the date on the note from January 5 to July 6, disbursed $2.25 million to Shar–Alan, and sold a 100 percent participation in the "loan" to Continental; it was defendant John Lytle at Continental who authorized the purchase of the participation. The reason for Patterson's changing the date on the note was that Continental would not have bought a participation in a loan secured by a promissory note that had already expired.

We should point out that the purchase of a 100 percent participation in a loan is not quite the same thing as the purchase of the loan itself. *First National Bank v. Clay–Hensley Commission Co.*, 170 Ill.App.3d 898, 121 Ill.Dec. 411, 525 N.E.2d 217 (1988). As the purchaser of a 100 percent participation in the Singletary "loan," Continental would of course (had it been a valid loan) be entitled to all the interest and, when the time for repayment arrived, to all the principal as well. But Penn Square, as the seller of a participation rather than an assignor of the loan, remained the lender and was obligated to service the loan.

Singletary first learned of the $2.25 million "loan" when he received a notice from Penn Square that it was due and payable; but in response to his inquiries he was assured that the notice was the result of a computer error. Penn Square collapsed on July 5, 1982, and later that month Singletary began meeting with officers of Penn Square, Continental, and the Federal Deposit Insurance Corporation, the receiver for Penn Square, in an effort to resolve the status of the so-called loan. Continental, while making no effort actually to collect the loan from Singletary, would not acknowledge that it was invalid. It had profound doubts about the loan's validity but did not voice them to Singletary. In 1983 the FDIC sold the Singletary "loan" to Continental, which thus became the lender as well as the 100 percent participant in the loan.

Also in 1983 Heston went bankrupt, a catastrophe that the plaintiffs attribute, a little implausibly (for they overlook the collapse of oil prices in 1982, which was the catalyst for the Penn Square debacle—and Heston was in the oil business), to their uncertainty over whether Singletary owed Continental $2.25 million. In 1984 Patterson and Lytle were indicted on a variety of charges, including misappropriation in connection with the Singletary "loan." Not until mid–1988 were the criminal proceedings against Patterson and Lytle resolved, when both pleaded guilty to various counts of bank fraud. Lytle admitted having caused Continental to make a $2.25 million loan to Singletary in violation of federal banking law, and Patterson admitted having aided and abetted Lytle in that offense. The reason that a fictitious loan caused a misappropriation of bank funds is that, as we mentioned earlier, the proceeds of the Singletary "loan" *had* been paid, to Shar–Alan. Continental argues that since the altered note facilitated the very transaction that Singletary wanted to consummate, he shouldn't complain. But obviously a bank is not permitted to lend money to a person without his knowledge, then try to enforce the terms of the loan by saying that he benefited from it. The benefit could affect the amount of damages to which the "borrower" was entitled, but it would not excuse the fraud. Anyway, it is unclear whether there was any benefit to Singletary. The bank had already agreed to lend the money to Heston and Heston's coventurer, Mahan–Rowsey. After the doctored note, Singletary and Heston together owed Penn Square $4.25 million, and Mahan–Rowsey owed the bank $2.25 million. Should Mahan–Rowsey

falter, the bank would be able to go after Heston and Singletary for the full amount of the loan. That was no benefit to Singletary!

Another of Continental's alternative grounds of affirmance is that the plaintiffs suffered no compensable injury. Insofar as they were injured as shareholders of Heston, their injury was derivative and cannot be made the basis of an independent suit. *Kagan v. Edison Bros. Stores, Inc.,* 907 F.2d 690, 692 (7th Cir.1990); *Mid–State Fertilizer Co. v. Exchange National Bank,* 877 F.2d 1333, 1335–36 (7th Cir.1989). Even Tatum Singletary, the obligor on the note, seems to have been injured (if at all) only through the collapse of Heston, his corporation; but if the phony loan injured Heston and only derivatively Singletary, he cannot recover his damages either; the cause of action belongs to Heston. *Id.* at 1336. If there was any direct injury to the plaintiffs, it did not come close to $90 million, the amount sought in the complaint for compensatory damages, and it could not conceivably warrant the $270 million in punitive damages sought. Judges, far from being impressed by extravagant damages claims, which can be designed only to generate publicity for the plaintiffs or their lawyers and to get defendants into trouble with their accountants and with regulatory agencies, such as the SEC and (in this case) the FDIC, are apt to believe that the plaintiffs' other assertions are equally extravagant. The sum of money requested as damages in the complaint is not a lid on the plaintiff's recovery of damages unless a default judgment is sought, Fed.R.Civ.P. 54(c), so there is normally and was here no valid reason for such grandstanding.

To the argument that they suffered no compensable injury the plaintiffs reply inconsequently that Continental cannot put an alternative ground for affirmance before us without filing a cross-appeal. A cross-appeal is necessary and proper only when a party wants to alter the judgment. *Massachusetts Mutual Life Ins. Co. v. Ludwig,* 426 U.S. 479, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976) (per curiam); *Byron v. Clay,* 867 F.2d 1049, 1050–51 (7th Cir.1989); *HCA Health Services v. Metropolitan Life Ins. Co.,* 957 F.2d 120 (4th Cir.1992). Continental doesn't want to alter the judgment; it just wants to defend the judgment on an additional ground. That is its privilege, provided the ground was not waived in the district court, *Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429, 439 (7th Cir.1987); *Midwest Commerce Banking Co. v. Elkhart City Centre,* 4 F.3d 521, 523 (7th Cir.1993), and it was not. So confident were the plaintiffs that Continental had to file a cross-appeal that they did not bother to address the merits of the alternative ground, which Continental had properly raised in its answering brief, in their reply brief. This was a risky tactic of the sort from which claims of legal malpractice are made. We need not consider the alternative ground, however, as it is plain enough that the suit was barred by the statute of limitations.

Patterson and Lytle pleaded guilty on June 30, 1988. The Singletarys read about the pleas in the newspaper, attended the sentencing hearing later that year, and in April 1989 filed this suit. The Illinois statute of limitations for fraud is five years, 735 ILCS 5/13–205; *Kinsey v. Scott,* 124 Ill. App.3d 329, 79 Ill.Dec. 584, 591, 463 N.E.2d 1359, 1366 (1984), and if it started to run when Patterson booked the phony loan and Continental bought a participation in it, the suit was barred in January 1987. It did not start to run quite that soon. The statute of limitations starts to run when the plaintiff's cause of action accrues, and in Illinois it accrues not when the plaintiff is injured but when he discovers (or should have discovered) that he has been injured. *Knox College v. Celotex Corp.,* 88 Ill.2d 407, 58 Ill.Dec. 725, 728–29, 430 N.E.2d 976, 979–80 (1981). That pushed the deadline for this suit forward to sometime in the summer of 1987, five years after Tatum Singletary learned that a phony loan had been booked against him. The other plaintiffs implicitly concede that they are charged with knowing whatever Tatum knew when he knew it.

It might be thought that the cause of action did not accrue until 1983, when Heston went broke. Until then, the phony loan and altered note were merely a potential menace to the plaintiffs and their enterprise. In the usual case, it is true, bankruptcy is not the injury but a way of treating the injury; and

we would never say that a claim for battery arose not when the victim was battered but when he entered the hospital for the treatment of his wounds. But the argument here is not that some underlying insolvency precipitated Heston's bankruptcy. It is that the cloud created by the phony note precipitated the bankruptcy with all its attendant costs. In such a case the bankruptcy, or more precisely the financial collapse that it marks, is the injury. But this is not argued and therefore need not be considered—and anyway the suit would still be time barred if the plaintiffs' claim accrued in 1983, for they didn't sue until six years later.

The only hope for the plaintiffs is one of the doctrines that permit the running of a statute of limitations to be suspended ("tolled," we lawyers say). They invoke two. Equitable estoppel suspends the running of the statute of limitations during any period in which the defendant took active steps to prevent the plaintiff from suing, as by promising the plaintiff not to plead the statute of limitations pending settlement talks or by concealing evidence from the plaintiff that he needed in order to determine that he had a claim. *Witherell v. Weimer*, 118 Ill.2d 321, 113 Ill.Dec. 259, 263, 515 N.E.2d 68, 72 (1987). Although "equitable estoppel" is sometimes used interchangeably with "fraudulent concealment," *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir.1990), the latter is, strictly, a subset of the former, since neither fraud nor concealment is required for equitable estoppel, only conduct or representations by the defendant that prevent the plaintiff from suing before the statute of limitations has run. *Witherell v. Weimer, supra*, 113 Ill.Dec. at 263–64, 515 N.E.2d at 72–73; see also *Mega v. Holy Cross Hospital*, 111 Ill.2d 416, 95 Ill.Dec. 812, 816, 490 N.E.2d 665, 669 (1986). The plaintiffs argue that Continental should be equitably estopped to plead the statute of limitations by its having insisted on the validity of the Singletary loan long after Continental knew it was phony. But a mere denial of liability—except in a case like *Witherell* where the defendant had a fiduciary relation to the plaintiff, entitling the latter to rely on the advice of the former—cannot be the foundation of an equitable estoppel. See also

*Hagney v. Lopeman*, 147 Ill.2d 458, 168 Ill. Dec. 829, 590 N.E.2d 466 (1992). Otherwise statutes of limitations would be toothless; the only cases in which they could be successfully pleaded would be ones in which the defendant acknowledged liability. It is not the denial of liability or a refusal to cooperate in making the plaintiff's case that extends the statute of limitations, *Tomes v. Chrysler Corp.*, 60 Ill.App.3d 707, 18 Ill.Dec. 71, 74, 377 N.E.2d 224, 227 (1978); *Smith v. City of Chicago Heights*, 951 F.2d 834, 842 (7th Cir. 1992), but affirmative efforts to delay the plaintiff's bringing suit. *Pack v. Santa Fe Park Enterprises, Inc.*, 209 Ill.App.3d 648, 154 Ill.Dec. 360, 363, 568 N.E.2d 360, 363 (1991); *Cada v. Baxter Healthcare Corp., supra*, 920 F.2d at 450–51. The exception mentioned above is inapplicable, because a lender is not his borrower's fiduciary. *Verbaere v. Community Bank*, 148 Ill.App.3d 249, 101 Ill.Dec. 519, 524, 498 N.E.2d 843, 848 (1986); *Pommier v. Peoples Bank*, 967 F.2d 1115, 1118–20 (7th Cir.1992) (applying Illinois law); *Brazell v. First National Bank & Trust Co.*, 982 F.2d 206, 209 (7th Cir.1992).

The other tolling doctrine that the plaintiffs invoke goes by the name equitable tolling, and permits a plaintiff to sue after the statute of limitations has expired if through no fault or lack of diligence on his part he was unable to sue before, even though the defendant took no active steps to prevent him from suing. *Heck v. Humphrey*, 997 F.2d 355, 357 (7th Cir.1993); *Smith v. City of Chicago Heights, supra*, 951 F.2d at 839–40; *Cada v. Baxter Healthcare Corp., supra*, 920 F.2d at 451. He might have been injured and known he was injured, at which point the statute of limitations began to run, yet have been unable despite all reasonable diligence to learn that he had been injured by a wrongful act or to learn the wrongdoer's identity. Continental argues, however, that the doctrine does not exist in Illinois, and therefore that a plaintiff who knows he has been injured by a wrongful act but does not know the wrongdoer's identity still must sue within the statutory period unless the defendant has taken active steps to prevent a timely suit, in which event the plaintiff could plead equitable estoppel.

On this issue all that is clear is that it is unclear whether Illinois has recognized the doctrine of equitable tolling. *Smith v. City of Chicago Heights, supra,* 951 F.2d at 839 n. 5.

The plaintiffs seek to finesse the issue by arguing that the applicable *accrual* rules are those of Oklahoma rather than those of Illinois, and in Oklahoma a claim does not accrue until the plaintiff knows both that he has been injured and who the injurer is. *In re 1973 John Deere 4030 Tractor,* 816 P.2d 1126, 1130 (Okla.1991). The difference between accrual and tolling is clear enough; the date of accrual is when the statute of limitations begins to run in the absence of tolling, which operates to interrupt and thus postpone that running. But in the form made, the plaintiffs' argument is very peculiar. For they concede that the five-year period of the Illinois statute of limitations for fraud applies to their claim; they want only to graft Oklahoma's accrual rules onto it. To take the period of limitations from one statute and the accrual date from another, however, is like grafting a giraffe's head onto an alligator's body. The optimal period depends on the accrual and tolling rules, and vice versa. *Hardin v. Straub,* 490 U.S. 536, 539, 109 S.Ct. 1998, 2001, 104 L.Ed.2d 582 (1989); *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 463–64, 95 S.Ct. 1716, 1721–22, 44 L.Ed.2d 295 (1975). So it is no surprise that Oklahoma, which has the more generous accrual rule, has the shorter statute of limitations.

Sometimes these unfortunate hybrids are created, when federal courts "borrow" state limitations periods for federal cases in which there is no statute of limitations and then graft onto them federal common law accrual or tolling doctrines. E.g., *McCool v. Strata Oil Co.,* 972 F.2d 1452, 1460–61 (7th Cir. 1992). But this is not a borrowing case. Illinois fraud law has a statute of limitations, and for purposes of choice of law statutes of limitations are treated as procedural rules. *Cox v. Kaufman,* 212 Ill.App.3d 1056, 156 Ill.Dec. 1031, 1035, 571 N.E.2d 1011, 1015 (1991); *Jackson v. Shuttleworth,* 42 Ill. App.2d 257, 192 N.E.2d 217, 218 (1963). (For purposes of deciding under *Erie R.R. v.*

*Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), whether state or federal law applies, they are substantive, but that is irrelevant. *Sun Oil Co. v. Wortman,* 486 U.S. 717, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988).) So the forum state, here Illinois, can and does supply the complete statute of limitations for use in this case, even if, an unresolved question, the law of Oklahoma supplies the substantive law applicable to the conduct of Continental and the other defendants in relation to the loan.

All this is an aside. For even if Illinois limitations law, applicable here as we have just said, contains a doctrine of equitable tolling and therefore permits a plaintiff to delay suing until he has learned the identity of the person who has wronged him, the judge was right to grant summary judgment for the defendants. The doctrine requires reasonable diligence, and the uncontested facts show that the plaintiffs failed to use reasonable diligence to discover that they had been wronged by Continental and Lytle as well as by Patterson. (We do not know how it could possibly be argued that the plaintiffs were in the dark about Patterson after the summer of 1982.) According to the report of an FBI interview of Tatum Singletary, dated September 30, 1982—a report the plaintiffs concede to be an accurate record of what Singletary said and was told—he said that the June 28, 1982, note-payable notice that he received from Penn Square Bank not only indicated that he owed the bank $2.25 million on a loan he had never taken out, but also stated the date of the note as July 6, although he had never signed an agreement extending the maturity of the note that had expired on January 5. The report further reveals that in August 1982 Singletary had been told by Ann Liddell of Continental that Patterson had presented the loan to Continental for participation, that she had turned it down on Continental's behalf, and that upon returning from a vacation she had discovered that the loan was listed on Continental's books and that "Patterson had gone through John Lytle of CINB[Continental Illinois National Bank] to get this loan booked at CINB." Singletary had also learned from Liddell at this meeting that all that Continental had securing this loan was an expired

letter of credit and the promissory note that Singletary had signed in January backing the letter.

A reasonable person knowing what Singletary admits having learned in August 1982, almost seven years before he sued Patterson, Lytle, or Continental, would have strongly suspected that Lytle had either negligently or deliberately misrepresented Tatum Singletary's financial obligations. This reasonable person might have thought it *possible* that Lytle had been innocent of the alteration in the note. But only barely possible, for Ann Liddell had virtually accused him to Singletary of having booked the loan in violation of the bank's policies, and if so this suggested at the very least a *negligent* wrong against Singletary for which Continental might well be liable, at least after it bought the loan and ceased to be a purely passive participant. *Bontkowski v. First National Bank*, 998 F.2d 459, 462 (7th Cir.1993). And someone at Penn Square Bank, probably Patterson, plainly had committed a fraud against Singletary by altering the note and booking the loan on Penn Square's books. Had Singletary sued Penn Square and Patterson, pretrial discovery would have led quickly to Lytle and Continental. But even if the collectibility of a judgment against the bankrupt bank and its malfeasant officer seemed too remote a possibility to make a lawsuit at that time inviting, a reasonable person knowing what Singletary knew about Continental's involvement through Lytle would have begun to investigate to see whether the Singletarys might have a cause of action against Continental, the logical deep-pocket defendant. It would not have taken seven years to uncover enough evidence to satisfy the duty of reasonable precomplaint inquiry imposed by Rule 11 of the Federal Rules of Civil Procedure. In fact the plaintiffs did nothing till the guilty pleas were reported in the newspapers six years later, and even then proceeded in leisurely fashion, taking almost another year to file suit. Realistically, all this dawdling may reflect awareness that compensable injury would be difficult to show, and confidence that Continental would not try to collect the note.

The duty of reasonable diligence imposed by tolling doctrines is a *continuing* duty, *Anderson v. Wagner*, 79 Ill.2d 295, 37 Ill.Dec. 558, 571, 402 N.E.2d 560, 573 (1979); *Foster v. Plaut*, 252 Ill.App.3d 692, 192 Ill.Dec. 238, 243, 625 N.E.2d 198, 203 (Ill.App. Aug. 27, 1993); *Heck v. Humphrey, supra*, 997 F.2d at 357. It is immaterial that on the day the statute of limitations began to run, sometime in the summer of 1982, the plaintiffs did not have enough evidence in hand to file a suit. A five-year statute of limitations gives the victim of a wrong five years after he discovers that he has been injured to sue (which is why it would not be irrational for a state to decide not to recognize the doctrine of equitable tolling, as Illinois may not have done). Only if he acts with reasonable diligence throughout this period can he plead in the name of equity for an extension. If the plaintiffs had begun investigating Continental's complicity in the phony loan shortly after the meeting between Tatum Singletary and Ann Liddell reported in the FBI interview report, and had been unable within the next five years, despite all reasonable efforts, to obtain enough evidence to file suit against Continental, the doctrine of equitable tolling, assuming it exists in Illinois, would give them such additional time as they reasonably needed. They did no investigating. They slept. By the time newspaper publicity about the guilty pleas of Patterson and Lytle woke them up, the statute of limitations had expired. Even then, these sophisticated business people fiddled for many months.

The significance of Singletary's having known by August 1982 that he had been wronged, even if he was not sure by whom, should thus be apparent: knowing that he had been wronged, he was obliged as a reasonable person to begin inquiring as to who might have wronged him. Knowledge that one has been wronged is not an absolute bar to extending the statute of limitations beyond the date at which the knowledge was acquired if equitable tolling is permissible, but it is relevant to assessing the diligence of a plaintiff's efforts to learn the identity of the wrongdoer.

Statutes of limitations serve important public purposes. Victims of wrongful acts who want to extend a statute of limitations against defendants who have not actively tried to delay being sued must show that they acted as expeditiously as was feasible in the circumstances. So manifestly absent is any such proof in this case that the district judge was required as he did to grant summary judgment for the defendants and dismiss the suit.

There are some other issues but, like the issue of compensable injury, they are academic in light of our ruling on the statute of limitations. The judgment is affirmed as to all parties except Lytle and Patterson; as to them, the case is remanded to ascertain their state of citizenship, as we explained earlier.

AFFIRMED IN PART AND REMANDED WITH DIRECTIONS.