Charles R. VAN DE WALLE, Plaintiff,

v.

SALOMON BROTHERS INC., Lehman Brothers Inc., formerly known as Shearson Lehman Hutton, Inc., Defendants.

C.A. No. 9894.

Court of Chancery of Delaware, New Castle County.

Submitted: Aug. 4, 1998.
Decided: Nov. 25, 1998.

Pamela S. Tikellis of Chimicles, Jacobsen & Tikellis, Wilmington, Delaware, of counsel, James R. Malone, Jr. and Pamela M. Nicolaysen, Haverford, Pennsylvania, for Plaintiff.

Robert K. Payson of Potter Anderson & Corroon, Wilmington, Delaware, of counsel, Lyndon M. Tretter of Davis Weber & Edwards, New York, New York, for Defendants.

## OPINION

STEELE, Vice Chancellor.

Plaintiff Charles R. Van De Walle ("Van de Walle") invokes § 11 of the Securities Act of 1933 (the "Act"),[1] to support a claim that the Prospectus of L.F. Rothschild, Unterberg, Towbin Holdings, Inc. ("L.F. Rothschild") improperly failed to describe certain risky business ventures contemplated by management at the time of L.F. Rothschild's initial public offering (IPO) of common stock. Van de Walle filed this action more than one year after the claims arose. Should the one-year statute of limitations codified at § 13 of the Act bar plaintiff's claims where: (a) the plaintiff fails to plead sufficient facts showing reasonably diligent efforts which nonetheless failed to uncover the basis for his claims before the statute ran; and, (b) the defendants have demonstrated numerous media reports, L.F. Rothschild S.E.C. filings, and information contained in the Prospectus itself would have put a reasonably diligent person in Van de Walle's position on inquiry notice more than twelve months before he filed suit? The answer is "yes" and I, therefore, grant summary judgment to defendants, Salomon Bros., Inc. and Lehman Bros., Inc. (the "Underwriters").

## BACKGROUND & PROCEDURAL POSTURE

L.F. Rothschild, a holding company for the well-known investment banking and financial services firm of the same name, issued an IPO on March 13, 1986. It employed the Underwriters to assist it in the delivery of its stock to the public. Van de Walle bought 100 shares during the IPO at $20.50 per share. He sold them at $16 ⅝ per share (at a total loss of $388.00) in July 1986.

Van de Walle waited two years after his sale and more than twenty-six months after the effective date of the Prospectus to file this action against L.F. Rothschild, its broker-dealer subsidiary (the IPO's lead underwriter), its top officers and directors, the Underwriters, and certain L.F. Rothschild stockholders who sold shares during the IPO.[2] L.F. Rothschild and its broker-dealer subsidiary later filed for bankruptcy. Vice Chancellor Hartnett stayed this action while the bankruptcies proceeded. Eventually, bankruptcy proceedings extinguished Van de Walle's claim against those two companies. Vice Chancellor Hartnett lifted the stay on April 29, 1993. Defendants then filed a motion to dismiss or for summary judgment.

On July 14, 1994, I heard oral argument. In my August 2, 1994 Opinion, I dismissed the claims against the directors and officers for lack of personal jurisdiction. I ordered further discovery on the personal jurisdiction of the stockholder sellers, but plaintiff voluntarily dropped those claims. On October 2, 1997, I denied certification of plaintiff's proposed class and Van de Walle proceeded in his individual capacity. The only remaining defendants are the Underwriters, who assisted the lead underwriter in distributing the stock and who, Van de Walle alleges, had a duty to verify the completeness and accuracy of the Prospectus. The Underwriters claim § 13 bars these claims, which were filed more than one year after the alleged wrongs took place. I allowed the parties to engage in discovery on this discrete issue. This is my Opinion on the Under-

---

**1.** 15 U.S.C. § 77k.

writers' renewed motion for summary judgment.

## LEGAL STANDARD

Section 13 codifies the statute of limitations for bringing a claim under § 11:

> No action shall be maintained to enforce any liability created under section 77k or 77l (2) of this title [§§ 11 & 12(2) of the Act] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.... [3]

■ Section 13 requires a plaintiff to file a § 11 claim within a year of the alleged wrong or within a year of when discovery of the wrong should have been made. It codifies a statutory equivalent to the federal version of the common law theory of equitable estoppel.[4] The parties agree that Van de Walle filed this action more than two years after L.F. Rothschild's Prospectus became effective. Therefore, to avoid a bar of his late-filed claims, Van de Walle must plead facts showing that, even with the exercise of "reasonable diligence," he could not have become aware of the facts upon which he makes his claim until within a year of his filing.[5] If Van de Walle sufficiently pleads facts showing that he could not have known those essential facts, the Underwriters may rebut that assertion. By introducing evidence such as news clippings, direct knowledge of the plaintiff, information contained in the Prospectus, etc., the Underwriters may show that information available more than a year before Van de Walle filed would have put any person making reasonably diligent efforts on "inquiry notice" of the claims. By establishing that the facts necessary to establish inquiry notice of Van de Walle's claims were available one year before Van de Walle filed suit, Underwriters start the § 13 statute-of-limitations clock ticking and defeat tolling.

■ A court evaluating a defendant's "inquiry notice" rebuttal of a plaintiff's tolling allegations must define what sort of facts and circumstances would adequately inform a person in the plaintiff's shoes that further inquiry was necessary and how much investigative effort should constitute "reasonably diligent" efforts.[6] Federal appellate courts have held that it is a mixed question of law and fact, with the specific circumstances of each case defining the nature of the information necessary to establish "inquiry notice" and the level of effort rising to the level of reasonably

---

3. 15 U.S.C. § 77m.

4. *Cook v. Avien, Inc.*, 1st Cir., 573 F.2d 685, 695 (1978) ("The doctrine of fraudulent concealment is the common law counterpart of the 'discovery' standard prescribed by § 13 to limit actions brought under § 12(2) of the 1933 Act. Thus, the running of both statutes of limitations is triggered by identical considerations."). More precisely stated, § 13's tolling prong is the codified counterpart to the doctrine of equitable estoppel for it is not limited to fraud as grounds for excusing the plaintiff from discovering the alleged wrong within a year. *Singletary v. Continental Ill. Nat'l Bank & Trust Co. of Chicago*, 7th Cir., 9 F.3d 1236, 1241 (1993) ("Although 'equitable estoppel' is sometimes used interchangeably with 'fraudulent concealment,' the latter is, strictly, a subset of the former, since neither fraud nor concealment is required for equitable estoppel, only conduct or representations by the defendant that prevent the plaintiff from suing before the statute of limitations has run.").

5. *Cook*, 573 F.2d at 695 (citing L. Loss, SECURITIES REG. ch. 11C(1)(f)(ii), at 1744 (2d ed.1961) for proposition that "when the very statute which creates the cause of action also contains a limitation period, the statute of limitations not only bars the remedy but also destroys the liability, and therefore the plaintiff must plead and prove facts showing that he is within the statute.").

6. *Id.* at 696–97 ("In determining whether an investor has made reasonable inquiries a court must consider, *inter alia*, the nature of the misleading statements alleged, the opportunity to discover the misleading nature of the statements, and the subsequent actions of the parties.") (citations omitted).

diligent.[7] It is worth noting, however, that the information necessary to put a plaintiff on inquiry notice is not necessarily the exact same information necessary to state a claim.[8]

In this matter, I note that the plaintiff, a sophisticated stock trader, seeks to impose § 11 liability for alleged omissions in L.F. Rothschild's Prospectus. The nature of most of those omissions can be generalized as a failure to describe new business activities, the new activities' risk, and the impact of those activities on L.R. Rothschild's financial performance. For those claims, I conclude that public information including media statements, S.E.C. filings, and the Prospectus itself stating L.F. Rothschild would engage in the new activity would put Van de Walle on inquiry notice not only of the activity itself, but the potential risk and financial impact involved.[9] If he had alleged specific risks or specific financial consequences, the mere disclosure of the business activities might be insufficient, but Van de Walle's generalized allegations, reproduced *infra*, describe risks and financial consequences implicit in the conduct of business. Therefore, the statute of limitation for each claim would be triggered by the public release of the document describing the activity.[10]

Van de Walle claims that even if publicly disclosed documents contained information sufficient to put him on inquiry notice, the rosy forecasts and upbeat tone of L.F. Rothschild's public representations during the same period lulled him into a false sense of security, excusing him from pursuing his claims earlier. It is true that federal courts have recognized interceding factors—usually an issuer's fraudulent representation that all is well made to an investor investigating suspicious circumstances—may lull the investor into a false sense of security, effectively obstructing the import of the facts otherwise putting the investor on inquiry notice .[11] I conclude, however, even giving the plaintiff the benefit of all reasonable inferences, that the facts do not support this defense here. I deem a reasonable person with Van de Walle's sophistication capable of discriminating between hard facts on current performance and the puffing one may reasonably expect in corporate statements. The glowing forecasts and rosy predictions alleged by Van de Walle did not directly dispute the disclosed facts that a reasonably diligent person would have noticed and found significant.[12] The mere fact

7. *Id.* ("Although the question of whether reasonable diligence has been exercised is factually based, we conclude that the actual determination is a sufficiently mixed question of law and fact to permit an appellate court to resolve the issue at least where the action below was tried to the court.") (citations omitted).

8. *Platsis v. E.F. Hutton & Co., Inc.*, W.D.Mich., 642 F.Supp. 1277, 1291 (1986) ("Plaintiff need not know all of the facts which establish that an untrue statement or omission has been made before the one year period starts to run.").

9. *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 7th Cir., 67 F.3d 605, 610 (1995) ("In today's society, with the advent of the 'information superhighway,' federal and state legislation and regulations, as well as information regarding industry trends, are easily accessed. A reasonable investor is presumed to have information available in the public domain, and therefore Whirlpool is imputed with constructive knowledge of that information.").

10. *Whirlpool*, 67 F.3d at 609 ("Inquiry notice starts the running of the statute of limitations 'when the victim of the alleged fraud became aware of facts that would have led a reasonable person to investigate whether he might have a claim.' "); *Id.* at 610 ("A reasonable investor is presumed to have information available in the public domain....").

11. *E.g., Singletary v. Continental Ill. Nat'l Bank*, 7th Cir., 9 F.3d 1236, 1241 (1993) ("Equitable estoppel suspends the running of the statute of limitations during any period in which the defendant took active steps to prevent the plaintiff from suing, as by promising the plaintiff not to plead the statute of limitations pending settlement talks or by concealing evidence from the plaintiff that he needed in order to determine that he had a claim.").

12. *Whirlpool*, 67 F.3d at 610 (holding that when issuer's rosy predictions were shown to be dramatically wrong, a reasonable investor

that L.F. Rothschild or others predicted a future different from the outcome indicated by the disclosed facts cannot dissuade a reasonably diligent investor from further inquiry about what the disclosed facts portend.[13] The federal securities laws replace caveat emptor with significant consumer protections, namely mandatory disclosure and antifraud provisions, but reasonable diligence and a certain amount of self-education, is still required of the investor.[14] Here, the upbeat tone of L.F. Rothschild's representations did not relieve Van de Walle of his obligation to inquire further into the issues which he now claims were omitted from the L.F. Rothschild Prospectus.[15] "To hold otherwise would permit the securities acts to be used as havens for speculation and a buffer against any investment loss." [16]

## RULINGS OF LAW

I grant the Underwriters' motion on two equally appropriate but alternative grounds.

### A. Pleading Insufficiency

■ First, I have inspected the Amended Complaint and found it fails to plead

facts which could support the view that even with reasonably diligent efforts Van de Walle could not uncover the facts upon which he makes his claims. Indeed, his pleadings are conclusory and insufficient as a matter of law:

> 51. Prior to December 7, 1987, plaintiff and the members of the Class could not, in the exercise of reasonable diligence, have discovered that the Prospectus, and the Registration Statement of which it formed a part, contained untrue statements of material fact, or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. This action was commenced within three years after the shares of Rothschild were offered, and within one year of the date when discovery of the false and misleading statements contained in the Registration statement pursuant to which the shares were offered could have been made in the exercise of reasonable diligence.[17]

The only other mention of December 7, 1987 in the Complaint, aside from a repeat of the conclusory allegations quoted above,[18] is the following allegation: "On or

would have become suspicious and investigated). Moreover, a reasonable investor in Van De Walle's position would have juxtaposed any positive predictions with the media's negative portrayal of L.F. Rothschild's ambitious expansion. *E.g.,* Ida Picker, "L.F. Rothschild Branches Out," *Investment Dealers' Digest* (Dec. 15, 1986) (describing L.F. Rothschild's ambitious management to be "[l]ike a child in a candy shop with a fistful of dollars").

13. *See Kramas v. Security Gas & Oil Inc.,* 9th Cir., 672 F.2d 766, 771 (1982) ("This undisputed evidence was sufficient to establish that Kramas should have known of the allegedly fraudulent conduct upon which he now relies. Kramas argues his continued confidence in the defendants is reflected in evidence that he was 'beguiled, patronized and solicited' by SEGO and continued to invest in SEGO projects. But the question is not whether Kramas continued to repose confidence in SEGO but whether in the exercise of reasonable diligence he should have been aware of defendants' allegedly fraudulent conduct.").

14. *Cook,* 573 F.2d at 698 ("[T]he exercise of reasonable diligence requires an investor to be reasonably cognizant of financial developments relating to his investment, and mandates that early steps be taken to appraise those facts which come to the investor's attention.").

15. *Whirlpool,* 67 F.3d at 610 ("[I]n light of our determination that the information Whirlpool needed to uncover the fraud was in the public domain, GN's continued attempts to explain away the discrepancies between the revised projections and the actual earnings could not have prevented Whirlpool from filing its complaint on time.").

16. *Cook,* 573 F.2d at 698.

17. Comp. ¶ 51.

18. Comp. ¶ 7 ("December 7, 1987 (the first date on which in the exercise of reasonable diligence, the existence of misstatements of material fact in the Registration Statement

about December 7, 1987, further layoffs of personnel, approximately 40 percent of its employees, were announced." By averring December 7, 1987 to be the date when he could have become aware of his claims, Van de Walle must be claiming that—*for the first time*—this announcement gave him reason to think that L.F. Rothschild's *Prospectus* misled him. Yet, the Complaint's own rhetorical style contradicts the singular significance to which Van de Walle seeks to elevate that date. For example, two sentences before that statement, the Complaint reads: "Subsequent revelations in December, 1987 underscored the breadth of the Company's problems." Van de Walle's Complaint underscores to emphasize that the December 7, 1987 developments *only reinforced* the impression of a company on a downward spiral. This inherent inconsistency contradicts Van de Walle's assertion that he could not have known of his claims before December 7.

Nowhere in the Complaint does Van de Walle explain why the 40% layoff galvanized his hitherto catatonic curiosity. Initially, a plaintiff seeking to toll the statute of limitations must allege facts showing that he could not with reasonable diligence uncover the facts upon which the claim rests within a year of the disputed IPO.[19] Van de Walle pleads no facts showing why he could not have discovered his claims earlier than he did and neglects to describe in a meaningful way why he eventually did start investigating his claim. The overall impression is that Van de Walle has no rational basis for not pressing his claims earlier. His cursory recitation of § 13's language avails him naught. His pleadings are conclusory and illogical. He has failed to meet his burden to plead sufficient facts justifying tolling of the statute of limitations. I grant summary judgment holding the claim to be barred as a matter of law.

and the existence of material omissions from the Registration Statement would have been discovered)").

**19.** *Cook,* 573 F.2d at 695.

## B. Plaintiff on Inquiry Notice

As a second alternative basis for granting summary judgment, I examine the facts alleged by the Underwriters to have put him on inquiry notice. Although Van de Walle has not met the predicate burden of alleging why he could not have reasonably diligently discovered his claims within the one-year statute of limitations, I conclude that even if he pled a *prima facie* showing that his claims were tolled, the evidence presented by the parties accompanying this motion unquestioningly demonstrates that facts constituting notice inquiry were publicly disclosed more than a year before Van de Walle filed. The following catalogs each of Van de Walle's claims and the public disclosure which triggered the statute of limitations more than a year before he filed:

1. *[T]he company's expansion plans called for it to enter into areas, including mortgage-backed securities and offerings of mutual funds, where it had not previously developed expertise*[20]

This allegation contains two claims: that L.F. Rothschild did not disclose its intention and the commensurate financial risk of (i) selling mortgage-backed securities and (ii) offering mutual funds. The Company's 3rd quarter 1986 10–Q stated: "During the quarter the Company employed personnel and began incurring other expenses in connection with establishment of its mortgage capital corporation subsidiary, which will originate, trade and distribute mortgage securities, and its mutual fund management subsidiary."[21] That document was filed on November 14, 1986 with the S.E.C. and put Van de Walle on inquiry notice that L.F. Rothschild was expanding into the mortgage-backed secu-

**20.** Comp. ¶ 56(a).

**21.** L.F. Rothschild Sept. 30, 1986 Form 10–Q at 11.

rities and mutual fund areas.[22] Van de Walle filed this action on May 16, 1988, nineteen months later.

2. *[T]he company's expansion plans entailed substantial increases in fixed costs that would adversely affect its earnings in the absence of substantial increases in revenues*[23]

Yet, the Prospectus states: "The Company's activities incur a high level of fixed costs, accentuating the effect on income of relatively modest changes in the general level of business."[24] The Prospectus described numerous new business ventures in which L.F. Rothschild intended to engage.[25] The combined effect gave Van de Walle inquiry notice of this claim. The Prospectus issued on March 13, 1986, twenty-seven months before Van de Walle filed this action.

3. *[T]he company's management had not achieved a consensus as to the wisdom of its expansion plans, but, instead, was divided into camps with Messrs. Unterberg and Towbin opposing much of the expansion program which was championed by Mssrs. Schoenthal and Mayer*[26]

Unterberg and Towbin's departure from L.F. Rothschild announced on December 15, 1986 received widespread media attention. "Top Officers Leave Investment Firm Amid Strategy Differences," *Associated Press* (Dec. 15, 1986) (attributing their departure to "differences of philosophy on the future direction of the firm"). Unterberg and Towbin's departure constituted inquiry notice and came eighteen months before Van de Walle filed this action.

4. *The section of the Prospectus setting forth selected financial data* (Prospectus at 10–11) *was rendered misleading by failure to disclose material facts tending to show that the results set forth for prior financial reporting periods might not be indicative of current or future performance as they reflected a concentration on underwriting of high-technology and initial public offerings which the Corporation planned to deemphasize and because the Corporation had embarked on a program of diversification calling for it [sic] move into unfamiliar areas in which it had not previously developed expertise and which were known to entail substantial increases in fixed costs*[27]

The Prospectus states:

[S]hifts have taken place in the relative contributions to revenues of different components of the Company's business. Revenues from principal transactions have increased in proportion to the total, reflecting an industry trend and favorable market conditions, as well as management's decision to increase the amount of capital allocated primarily to arbitrage and other equity and fixed-income trading. Commission revenues have declined in proportion to the total due to lower commission rates for institutional equity transactions and an increase in the number and relative proportion of institutional commission transactions. Investment banking and advisory fee revenues, particularly those derived from corporate finance, have fluctuated widely, principally reflecting conditions in the equity underwriting

---

22. *Menowitz v. Brown*, 2d Cir., 991 F.2d 36, 41 (1993) ("In this case, plaintiffs were placed on inquiry notice of their claims by the very SEC-mandated disclosure documents they rely upon in their complaints.").

23. Comp. ¶ 56(b).

24. Prospectus at 12.

25. *Id.* at 7, 12, 13 (noting L.F. Rothschild intended to expand its broker-dealer business, to increase capital invested in arbitrage, and the need to hire additional staff).

26. Comp. ¶ 56(c).

27. Comp. ¶ 57.

markets.[28]

That disclosure put Van De Walle on inquiry notice that past performance data might not reflect L.F. Rothschild's future financial income as the nature of its business evolved.

    5.  *The Management's Discussion section of the Prospectus failed to disclose a known trend which could reasonably be anticipated to have a material unfavorable impact upon the Company's revenues and income ...: the deterioration of Rothschild's business of underwriting high-technology and initial public offerings of equity securities as a lead underwriter*[29]

The Prospectus contained a table of issues Rothschild managed from 1981 to 1985, and that table illustrated the significant fluctuations in the IPO underwriting business.[30] It also stated that the "market for equity issues, which accounts for a large proportion of the Company's corporate finance underwriting activities, is cyclical, and the market for initial public offerings is subject to significant fluctuation."[31] "[T]he Company's businesses are particularly sensitive to changes in the markets for equity underwritings and the level of investor interest in emerging and mid-size growth companies."[32] The Prospectus put Van de Walle on inquiry notice of his claim.

    6.  *failed to disclose known uncertainties which could reasonably be expected to have a material unfavorable impact upon the company's revenues and income from continuing operations as follows: ... the company's diversification plans called for it to expand extensively into unfamiliar areas in which it had not previously developed ex-*

*pertise and in which its ability to generate revenues was unknown*[33]

The media reported extensively on L.F. Rothschild's business expansion. For instance, "L.F. Rothschild Makes Numerous Hires to Become More Competitive," *Securities Week* (Jul. 17, 1986) ("Institutional sales/trading, retail, research, asset management, yield products and correspondent services recently have seen additions, all areas in which the firm wants to be more active"); "L.F. Rothschild Branches Out," *Investment Dealers' Digest* (Dec. 15, 1986) ("L.F. Rothschild also started plunking down big bucks for new businesses, such as mortgage-backed securities, high yield "junk" bonds, and mutual funds. In addition, the firm plans to double the number of professionals in the London office from 50 to 100 over the next 12 months or so, and rebuild its retail division from the current 250 brokers to about 400"). The latter article (December 15, 1986) put Van de Walle on inquiry notice about the Prospectus' omission of L.F. Rothschild's expansion plans and their financial ramifications at least nineteen months before he filed.

    7.  *failed to disclose known uncertainties which could reasonably be expected to have a material unfavorable impact upon the company's revenues and income from continuing operations as follows: ... the Company's expansion plans required it to hire substantial additional personnel and to incur substantial additional fixed costs that would adversely affect net income in the absence of significant increases in revenues*[34]

The same media reports cited in subsection 6 as well as the Prospectus revealed

---

28.  Prospectus at 12.

29.  Comp. ¶ 58.

30.  *Id.* at 19.

31.  *Id.* at 18.

32.  *Id.* at 5.

33.  Comp. ¶ 58(a).

34.  Comp. ¶ 58(b).

that L.F. Rothschild would incur fixed costs as a result of its expansion plans.[35] The company's September 30, 1986 Form 10–Q states: "During the quarter the Company employed personnel and began incurring other expenses in connection with establishment of its mortgage capital corporation subsidiary, which will originate, trade and distribute mortgage securities, and its mutual fund management subsidiary." Thus, at least nineteen months before he filed, Van de Walle should have known, if he were reasonably diligent, that the Company incurred expenses as it expanded.[36]

> 8. the Company's reputation as an underwriter had been damaged by a sequence of public offerings which had engendered significant litigation for those companies whose securities were offered.[37]

Van de Walle asserts that L.F. Rothschild should have disclosed the damage to its reputation caused by litigation arising from IPOs that it managed. Making the questionable assumption that L.F. Rothschild had a duty to disclose the litigation's pejorative significance (as opposed to the litigation's mere existence), the Prospectus put Van de Walle on inquiry notice that L.F. Rothschild currently defended itself in litigation related to underwritings it had managed:

> The Company has been active in the underwriting of initial public offerings and other offerings by emerging and mid-sized growth companies, the securities of which often involve a higher degree of risk than those of more established companies.
>
> The Company is a defendant in class action suits seeking rescission and substantial damages relating to underwritings in which it was the manager or one of the managers and participated as a syndicate member in other underwritings that are the subject of litigation.[38]

In reality, the public statements cited above reflect just the tip of the iceberg. Substantial information on the issues about which Van de Walle complains appears in the record allowing one to catalogue multiple disclosures which would have put him on inquiry notice many times over as to each claim. The examples given above sufficiently demonstrate that Van de Walle slept on his rights and failed to pursue his claims in a reasonably diligent and timely fashion.

## CONCLUSION

I find that Van de Walle failed to plead facts sufficient to allow him to avoid the statutory bar to his claim. His own Complaint contradicts the assertion that December 7, 1987 was the first time that he could have become aware of the facts upon which he makes his claims. He pleads no facts showing why he could not have known earlier and, indeed, pleads facts demonstrating that he could. Alternatively, the Underwriters have overwhelmingly and uncontrovertibly demonstrated that multiple sources of information would have provided him with enough information to put him on inquiry notice of his claims long before the twelve month period preceding filing. Because these pleadings show no genuine issue of material fact exists and that defendants are entitled to judgment as a matter of law, I grant the Underwriters' motion for summary judgment.

---

35. Prospectus at 7, 12, 13.

36. L.F. Rothschild filed its Sept. 30, 1986 Form 10–Q on Nov. 14, 1986.

37. Comp. ¶ 58(c).

38. Prospectus at 6 (referring reader to a description of individual lawsuits). *See, e.g., Loudon v. Archer–Daniels–Midland Co.,* Del. Supr., 700 A.2d 135, 140 (1997); *Wolf v. Assaf,* Del.Ch., C.A. No. 15339, mem. op., Steele, V.C., 1998 WL 326662 (June 16, 1998); *see also Biesenbach v. Guenther,* 3d Cir., 588 F.2d 400, 402 (1978) (holding that board need not disclose its allegedly wrongful purpose in making business decision).